PRESTON M. AVERY AND LOIS A. AVERY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Avery v. Commissioner
Docket No. 4616-91
United States Tax Court
T.C. Memo 1993-344; 1993 Tax Ct. Memo LEXIS 344; 66 T.C.M. (CCH) 305; August 3, 1993, Filed *344 Decision will be entered under Rule 155. For petitioners: Martin A. Schainbaum. For respondent: Guy H. Glaser. RUWE
RUWE
MEMORANDUM OPINION RUWE, Judge: Respondent determined deficiencies in petitioners' Federal income taxes and additions to tax for fraud as follows: Additions to Tax
Year
Deficiency
Sec. 6653(b)
1979
$  5,521
$  2,760.50
1980
17,765
8,882.50
1981
21,447
10,723.50
After concessions, [1] *346 the issues for decision are: (1) Whether petitioners underreported income from rental properties during the years in issue, and if so, in what amount; (2) whether petitioners are entitled to additional deductions for the years in issue; (3) whether petitioners underreported long-term capital gain from the sale of residential real property (the Lincoln Avenue property) on their 1979 Federal income tax return; (4) whether petitioners underreported capital gain realized under section 1038 [2] upon repossession of the Lincoln Avenue property in 1980; (5) whether petitioner Preston M. Avery is liable for additions to tax for fraud under section 6653(b); [3] and (6) whether the proposed assessments are barred by the statute of limitations contained in section 6501. *345 [4]
Some of the facts have been stipulated and are so found. The stipulation of facts, first supplemental stipulation of facts, and attached exhibits are incorporated herein by this reference. Petitioners resided in San Jose, California, at the time they filed their petition. References to petitioner in the singular are to Preston M. Avery. Petitioner is a high school graduate. After serving in the Navy, *347 he studied civil engineering in college for about 1-1/2 years. He subsequently worked for the California Highway Department, Pacific Gas & Electric, and MacKay & Somps, a civil engineering firm. In 1969, after 12 years with MacKay & Somps as a surveyor, soils technician, and contractor liaison, petitioner resigned and started his own construction company, APEZ Construction, Inc. (APEZ). APEZ specialized in underground construction, e.g., pipeline work, water systems, and sewers. Petitioner was secretary/treasurer and sole shareholder of APEZ. During the years in issue, APEZ owned 100 percent of a subsidiary corporation called California Land and Sea, Inc. (CLS). CLS manufactured and sold boats and travel trailers made of steel and fiberglass. CLS also sold other recreational vehicles and products. Petitioner was also secretary/treasurer of CLS. Petitioner Lois A. Avery was president of both companies. During the years in issue, petitioner was the sole proprietor of an equipment-rental company, Avery Enterprises. Avery Enterprises rented equipment primarily to APEZ and occasionally to others. Petitioners also owned residential and commercial rental properties. These properties *348 will hereinafter be referred to as properties #1 through #11. For purposes of convenience, our findings of fact and opinion for each issue are combined. Even though resolution of the statute of limitations issue in petitioners' favor for any year would be dispositive of the issues for that year, we believe it preferable to first discuss the underlying factual issues since they also bear on whether the fraud exception applies to the normal 3-year period of limitations. Respondent's determination is generally presumed correct, and petitioners bear the burden of proving that determination incorrect by a preponderance of the evidence. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). As discussed in those portions of the opinion dealing with fraud, this presumption of correctness does not apply to respondent's allegations of fraud for purposes of sections 6501(c) and 6653(b). As explained, infra, we hold that the proposed assessment for the year 1979 is barred by the statute of limitations and that the proposed assessments for 1980 and 1981 are not barred. Issue 1. Unreported Rental Income
Property #1
Property #1, residential *349 real property located at 99 Carnegie Drive, Milpitas, California, was rented to Leon and Alwanda Shoumake during the years in issue. Petitioner and Mr. and Mrs. Shoumake did not execute a lease or other written rental agreement for any of the years in issue. The monthly rent which petitioners charged Mr. and Mrs. Shoumake in 1979 and 1980 was $ 275. In 1979, Mr. and Mrs. Shoumake fell behind in their rental payments, and in 1980, petitioners commenced eviction proceedings against them. On February 7, 1980, petitioners served a "Three-Day Notice to Pay Rent or Surrender Possession" and, on February 15, 1980, petitioner filed a complaint against Mr. and Mrs. Shoumake for "Unlawful Detainer (Failure to Pay Rent)". In that complaint, petitioner alleged that Mr. and Mrs. Shoumake failed to pay rent as follows: Date Amount September 1, 1979
$   100
October 1, 1979
275
November 1, 1979
275
December 1, 1979
275
January 1, 1980
275
February 1, 1980
275
Total
$ 1,475
Petitioner obtained a default judgment against Mr. and Mrs. Shoumake on February 27, 1980, in the amount of $ 1,531.50, which included court costs of $ 56.50. On March 7, 1980, Mr. and Mrs. Shoumake and *350 petitioner executed a written agreement wherein Mr. and Mrs. Shoumake promised to reimburse petitioner for the amounts of unpaid back rent, $ 433 in costs, and $ 137.50 for dishonored checks. At that time, Mr. and Mrs. Shoumake also endorsed a payroll check for $ 232.96 to petitioner. Petitioners raised Mr. and Mrs. Shoumake's monthly rent to $ 300 in October 1980. The rental rate remained at $ 300 throughout 1981. Mr. and Mrs. Shoumake continued to rent property #1 from petitioners for several years. Petitioners reported gross rental income from property #1 of $ 760, $ 1,200, and $ 2,400 for 1979, 1980, and 1981, respectively. Respondent contends that petitioners actually received rental income from property #1 in the amounts of $ 2,375, $ 4,356.50, and $ 3,600 in 1979, 1980, and 1981, respectively. Respondent calculated these amounts as follows: 1979
8 months of rental income at $ 275/month
$ 2,200
(installment payments of rent for first
eight months)
plus: rent paid for September
175
Total
$ 2,375
1980
7 months of rental income at $ 275/month
$ 1,925
(March through September 1980)
plus: 3 months of rental income of at $ 300/month
900
(October through December 1980)
plus: default judgment award
1,531.50
Total
$ 4,356.50
1981
12 months rental income at $ 300/month
$ 3,600
*351 Petitioners do not dispute the amount of rent charged to Mr. and Mrs. Shoumake during the years in issue. However, petitioners argue that Mr. and Mrs. Shoumake seldom paid rent and when they did, it was often not for the full amount. In support of their contention, petitioners have offered into evidence five handwritten notes bearing the purported signature of Mrs. Shoumake. All these notes apologize for not making full or timely payment of their rent. However, none of the notes refer to the amount of rent paid or to be paid, and only one of the notes bears a date, "10-24-78", and that is for a year not in issue. Petitioners have also offered rent receipts showing Mr. and Mrs. Shoumake paying rent in arrears. There are four receipts. The first three show receipt by petitioners in 1979 of rent for the latter months of 1978. The other receipt reflects payment in 1979 of late partial rent for previous months in 1979. In our view, the combination of the four receipts and the rent shown as owing in the 1979 unlawful detainer complaint indicate that, in addition to the $ 175 for September rent, rent for the first 8 months of 1979 was paid in full. [5]
*352 Petitioner testified that during the years in issue he kept rental receipt books and a checklist to record rent payments made by his tenants. The receipt books were purportedly of a type that retained a carbon copy of the receipts issued. Petitioner testified that upon receipt of a rental payment, he would record it in the receipt book and check it off on his checklist. Petitioner testified that he used the checkoff sheets and receipt books to determine the amount of rent paid by his tenants, including the Shoumakes, in each of the years at issue. However, petitioners have failed to produce the checkoff sheets or receipt books for this or any other rental property for any of the years in issue. Petitioner was not even able to testify as to his recollection of the amounts of rent that went unpaid. Furthermore, it seems unlikely that petitioners allowed the Shoumakes to continue to reside on the property without meeting their rental obligation. Petitioners were obviously concerned enough about collecting rent from the Shoumakes to obtain a judgment against them. In light of the foregoing and the other evidence indicating that petitioners intentionally understated rental income *353 from other rental properties, [6] we sustain respondent's calculation of income received from property #1. Property #2
Property #2, residential real property located at 538 Fisk Avenue, San Jose, California, was rented to Julia G. Pena during the years in issue. Petitioners did not execute a written rental agreement with Ms. Pena. Petitioners charged Ms. Pena rent of $ 200 per month in 1979. The monthly rent in 1980 was $ 200 until the first of August when petitioners increased it to $ 295 per month, where it remained through the end of 1981. Petitioners reported gross rental income from property #2 of $ 900, $ 1,200, and $ 1,600 for 1979, 1980, and 1981, respectively. With respect to 1979, petitioner testified unequivocally at trial that Ms. Pena always paid her rent. While there was testimony that Ms. Pena paid some of her rent by making minor repairs to the property, petitioners have not offered evidence to establish any specific amount of rent exchanged for repairs *354 in 1979. The amount of rent petitioners received in 1980 and 1981 with respect to property #2 has been stipulated at $ 2,875 and $ 3,350. We find that petitioners received gross rent in the amounts of $ 2,400 in 1979, $ 2,875 in 1980, and $ 3,350 in 1981. Property #3
Property #3, residential real property located at 1118 Lily Avenue, Sunnyvale, California, was rented to Delores J. Isaacson during the years in issue. Ms. Isaacson and petitioners did not enter into a written rental agreement. Ms. Isaacson paid her rent by check and recorded the making of those checks in her check register. Petitioners reported gross rental income from property #3 of $ 1,400, $ 1,200, and $ 1,500, for 1979, 1980, and 1981, respectively. The parties have stipulated that petitioners received rental payments from Ms. Isaacson of $ 2,075, $ 1,900, and $ 2,625, in 1979, 1980, and 1981, respectively. At trial, respondent introduced copies of Ms. Isaacson's check register and offered Ms. Isaacson's testimony to establish additional rental payments of $ 550 and $ 500 in 1980 and 1981, respectively. Petitioners offered no books or records to show they received any lesser amount of rent. Accordingly, *355 we find that petitioners received gross rental income with respect to this property of $ 2,075 in 1979, $ 2,450 in 1980, and $ 3,125 in 1981. Property #4
Property #4, residential real property located at 4747 McCoy Drive, San Jose, California, was rented to Charles Layer during the years in issue. Petitioners did not execute a written rental agreement with Mr. Layer. Mr. Layer paid his rent regularly either in cash or by check. Mr. Layer also exchanged services for rent during the years in issue; i.e., performing repairs on the property he rented, and painting and installing carpets in some of petitioners' other rental properties. By Mr. Layer's estimate, the total value of labor and materials exchanged for rent was approximately $ 800 per year. Petitioners charged Mr. Layer rent of $ 298 per month in 1979. On March 20, 1980, Mr. Layer made out a check to petitioner for rent in the amount of $ 298. On July 20, 1981, Mr. Layer gave petitioner a cashier's check in the amount of $ 395 for rent. Petitioners reported gross rental income from property #4 of $ 2,000 for 1979 and 1980 and $ 2,400 for 1981. Respondent, in the notice of deficiency, determined that petitioners *356 received $ 3,576 in rent from property #4 for each year in issue. Respondent now asserts, based on all the evidence, that petitioners received $ 2,776, $ 3,261, and $ 3,940 in 1979, 1980, and 1981, respectively. [7] Checks and a money order for payment of rent by Mr. Layer establish a rental rate of $ 298 per month in 1979 and $ 395 per month in 1981. Respondent has determined that the increase in rent occurred on or about August 1, 1980, when petitioners raised rents for other tenants. Petitioners have failed to prove respondent's determination erroneous. Therefore, we sustain respondent's position that petitioners *357 received gross rental income with respect to this property in the amounts of $ 2,776 and $ 3,261 in 1979 and 1980, respectively. However, respondent has not affirmatively proven that petitioners received rents in 1981 in an amount in excess of that determined in the notice of deficiency. We therefore sustain respondent's determination of rent as determined in the notice of deficiency in the amount of $ 3,576 for 1981. Property #5
Property #5, residential real property located at 3386 Mount Everest Drive, San Jose, California, was rented to Clyde S. Milam during the years in issue. Petitioners charged Mr. Milam rent of $ 295 per month during 1979 and 1980, until August 1980, when rent was increased to $ 395 per month. Rent remained at $ 395 per month through 1981. Mr. Milam paid rent in cash and by check. Mr. Milam also performed repairs and maintenance on the house and deducted the cost of materials from his rent payment. Once, in 1981, Mr. Milam traded some iron with petitioner for a month's rent. Petitioners reported gross rental income from property #5 of $ 1,200 for 1979 and 1980 and $ 1,800 for 1981. Respondent contends that petitioners received rental payments *358 from Mr. Milam in the amounts of $ 3,178, $ 3,900, and $ 4,699.25 during the respective years. Respondent has introduced records of Mr. Milam that reflect the monthly rental charged Mr. Milam and document rental payments made by Mr. Milam of at least $ 2,688.68 in 1979, $ 3,511.19 in 1980, and $ 2,765 in 1981. However, respondent's figures are based in large part on a 1985 affidavit by Mr. Milam. The 1985 affidavit was obtained by Special Agent Murphy in the course of an earlier criminal tax investigation of petitioner. See infra pp. 41-42. In the affidavit, Mr. Milam states exact amounts of rent paid for the respective years in issue as follows: $ 3,178.28, $ 3,900, and $ 4,699.25. [8] The affidavit was based on Mr. Milam's memory in 1985 and the documents that Mr. Milam had in possession at that time. Furthermore, the amounts of rent stated in the affidavit, as well as the date of the rent increase, are consistent with the evidence with respect to rental rates on petitioners' other residential rentals. *359 Petitioners argue that Mr. Milam frequently wrote bad checks for rent. However, the record shows only two bad checks during the years in issue, at least one of which Mr. Milam made good. Petitioner also testified that Mr. Milam was eventually evicted for nonpayment of rent. Petitioners have offered no other evidence of this eviction, the year it occurred, or the amount of rent that went unpaid. Petitioners had an opportunity to examine Mr. Milam at trial but did not elicit testimony about Mr. Milam's alleged eviction. Petitioners have failed to produce records of rent received from Mr. Milam. In light of the foregoing, we find petitioners received rental income with respect to property #5 in the amounts of $ 3,178.28 in 1979, $ 3,900 in 1980, and $ 4,699.25 in 1981. Property #6
Property #6 consists of residential real property located at 10315 Moretti Drive, Cupertino, California. Petitioners reported gross rental income from property #6 of $ 1,500 for 1979 and 1980 and $ 1,600 for 1981. The parties have stipulated that petitioners received rent with respect to property #6 in the amounts of $ 2,050, $ 3,192.88, and $ 3,841.95 for 1979, 1980, and 1981, respectively. *360 Property #7
Property #7 is residential real property located at 1497 Mt. Lassen Drive, San Jose, California. Petitioners reported gross rental income from property #7 of $ 1,200 for 1979 and 1980 and $ 1,400 for 1981. On brief, respondent argues that the amounts of rent received with respect to this property cannot be reasonably and accurately reconstructed, and consequently, respondent accepts the amounts of rent reflected on petitioners' returns. Property #8
Property #8, residential real property located at 3178 Mt. Rainier Drive, San Jose, California, was rented to Jerry Gillette during the years in issue. Petitioner testified that Mr. Gillette was his best tenant and always paid his rent in a timely manner. Petitioners reported gross rental income from property #8 of $ 1,800 for 1979 and 1980 and $ 2,400 in 1981. The parties have stipulated the amounts of rent received with respect to property #8 as follows: $ 3,300 in 1979, $ 3,795 in 1980, and $ 4,500 in 1981. Property #9
Property #9, commercial real property located at 2979 LaFayette Street, Santa Clara, California, was rented in part to Puett-Bayshore, Inc. (Puett-Bayshore) during the years in *361 issue. Petitioners received rent from Puett-Bayshore in the amounts of $ 9,020, $ 9,037.50, and $ 9,000, in 1979, 1980, and 1981, respectively. Petitioners also rented a portion of property #9 to APEZ. APEZ issued petitioner a Form 1099 reflecting the payment of rent on property #9 for 1979 in the amount of $ 5,100. In 1980, APEZ issued a check to petitioner for $ 5,000 that was reflected in the corporation's cash disbursement journal as payment of "Rent on Lafayette [Property #9]". APEZ issued this check on October 31, 1980, but petitioner did not deposit it into his account until July 1981. In 1981, APEZ also issued a $ 5,000 check to petitioner, which it recorded as payment for "Rent on Lafayette [Property #9]". Based on the foregoing, we find that petitioners received total rental payments for use of this property in the amounts of $ 14,120 in 1979, $ 14,037.50 in 1980, and $ 14,000 in 1981. [9]
*362 Petitioners reported gross rental income from property #9 of $ 5,100, $ 5,000, and $ 2,500 for 1979, 1980, and 1981, respectively. Therefore, we find petitioners received, but failed to report, rental income of $ 9,020 in 1979, $ 9,037.50 in 1980, and $ 11,500 in 1981. Property #10
Property #10, commercial real property located at 20,000 Monterey Highway, Morgan Hill, California, was leased by petitioners to CLS for a 2-year term commencing January 1, 1979. Petitioner signed the lease as landlord and both petitioners signed as tenants on CLS's behalf. The lease provided for rent in the amount of $ 2,700 in the first year and $ 5,000 in the second year. In 1979, CLS issued petitioner a Form 1099 reflecting payment of rent in the amount of $ 2,700. Also in 1979, APEZ issued checks to petitioner in the following amounts: Check no.
Date
Amount
15135
4/9/79
$  5,000
15719
10/31/79
2,500
15720
10/31/79
5,000
15721
10/31/79
2,500
Total
$ 15,000
The cash disbursement journal for APEZ does not indicate the purpose of the first check for $ 5,000 (#15135). The following two checks for $ 2,500 and $ 5,000, respectively, were issued for payment of property rental *363 expense. The journal does not specify the property to which the rent payments pertain. The last check listed above, in the amount of $ 2,500, was listed in the cash disbursement journal as payment for equipment expense. Petitioners reported gross rental income from property #10 of $ 2,700 in 1979. Respondent contends that petitioners failed to report $ 2,100 of rental income in addition to the $ 2,700 reported on petitioners' 1979 personal return. Respondent's determination was made as follows: Total of checks from APEZ in 1979
$ 15,000 Amount reported on Schedule C
<5,100>
Amount attributable to rent paid for
property #9 (Form 1099)
<5,100>
Amount of rent from property #10 reported
on return (CLS)
<2,700>
Total unreported rental income on
property #10
$  2,100 Petitioners failed toproduce any records of rent received for property #10. Petitioners did not argue on brief, testify, or offer other evidence that the $ 2,100 received from APEZ was anything other than rent on property #10. On October 31, 1980, APEZ issued a check to petitioner in payment of "Rent on Monterey [Property #10]" in the amount of $ 15,000. APEZ also issued a check for "Rent on Monterey *364 [Property #10]" in the amount of $ 5,000 in October 1981. Petitioners reported gross rents from property #10 of $ 5,000 in 1980 and $ 2,500 in 1981, respectively. [10] Based on the foregoing, we find that with respect to property #10 petitioners received, but did not report, gross rental income of $ 2,100 in 1979, $ 10,000 in 1980, and $ 2,500 in 1981. Property #11
Property #11 is a two-bedroom mobile home located on the commercial property at 20,000 Monterey Highway, Morgan Hill, California (property #10). During the years in issue, *365 petitioners rented property #11 to Perry and Betty Welfring. Mr. Welfring was an employee of APEZ during the years in issue. Petitioners and Mr. and Mrs. Welfring did not enter into a written rental agreement with respect to the property for any of the years in issue. Mr. and Mrs. Welfring issued checks to petitioners totaling $ 1,800, $ 1,520, and $ 1,450, for 1979, 1980, and 1981, respectively. Respondent asserts that these amounts reflect rental payments. Petitioners did not report any gross rental receipts for the years in issue with respect to property #11. At trial, petitioner testified that Mr. and Mrs. Welfring's rent ranged from $ 10 to $ 200 per month. When asked whether the payments of $ 250 in April, May, and June of 1979 reflected $ 200 of rent and $ 50 of loan repayment, petitioner maintained that the entire amount in each month was in repayment of a loan. There is no evidence to corroborate petitioner's testimony that he loaned money to Mr. Welfring, nor did he produce any books, records or other evidence as to amounts of rent he actually charged or received from Mr. and Mrs. Welfring. In light of the foregoing, we find that petitioners have failed to prove *366 that they received less rental income than shown by respondent with respect to property #11. Based on the foregoing analysis, petitioners received unreported property rents in the amounts of $ 21,514.28 in 1979, $ 34,287.88 in 1980, and $ 28,442.20 in 1981. [11] See appendix A. [12]
*367 Petitioners concede that they did not report all gross income received with respect to these properties, but claim entitlement to additional deductions for repair, maintenance, and other expenses pertaining to the rental properties. Petitioners have submitted several canceled checks and receipts in an attempt to substantiate these additional expenses. [13] In addition, petitioner testified that he incurred expenses for each rental property as follows: Expenditures for maintenance and
repair for each year in issue
Property #1
$ 2,000/year
Property #2
1,000-2,000
Property #3
2,000-3,000
Property #4
1,000
Property #5
2,000
Property #6
2,000
Property #7
3,000
Property #8
500
Property #9
10,000
Property #10
20,000
Property #11
2,400
*368 We find petitioner's testimony unpersuasive. Having had the opportunity to hear and observe petitioner at trial, we do not find his testimony credible on this or any other issue. Petitioner's testimony was generally evasive and frequently in conflict with his prior testimony at his criminal tax trial. With respect to expenditures for rental repairs, petitioner's testimony was vague and self serving. He testified to a laundry list of repairs he purportedly made to a given property, but could not recall when these repairs were made. Nor did petitioner testify as to the cost of a specific repair. Petitioner made similar statements, lacking in specificity, with respect to all the residential rental properties. The documentation offered by petitioners does not support their claim for additional expenses. Furthermore, petitioners failed to offer any explanation for their failure to claim these expenses on their returns for the years in issue. Petitioners have failed to prove entitlement to any additional expense deductions with respect to rental activity. Issue 2. Additional Deductions
The next issue we must decide is whether petitioners are entitled to offsetting Schedules *369 A and C deductions for each of the years in issue. Petitioners contend that by virtue of additional deductions to which they are entitled, petitioners' taxable income was actually lower than that reported in each year in issue. With respect to Schedule A, petitioners argue that they are entitled to additional deductions for property tax expenses not previously claimed on their 1979, 1980, and 1981 tax returns in the respective amounts of $ 11,674.89, $ 1,240.14, and $ 767.08. In support of their position, petitioners introduced into evidence numerous checks and property tax statements pertaining to the years in issue. Petitioners have submitted statements of taxes due and owing for 1978 and 1979 pertaining to the Lincoln Avenue property in the amount of $ 675.71 and pertaining to a property designated as the "Bethel Island" property in the amounts of $ 227.68 and $ 871.85. [14] It is not clear from the Bethel Island statements what amount of tax is attributable to 1978 and what amount is attributable to 1979. None of the statements indicate whether payment was ever made, nor do any of the checks submitted by petitioners appear to pertain to these particular tax statements. In *370 fact, the tax statements pertaining to the Bethel Island property indicate that the State of California had a lien against the property for a prior year's delinquency. We do not consider these tax statements evidence of payment of those taxes in 1979. The canceled checks reflect payment of property taxes in 1979 totaling $ 9,899.65. However, petitioners have not attempted to prove that the amounts paid are not reflected in the $ 10,242 deduction for real estate taxes already claimed on petitioners' 1979 return. Furthermore, two of the checks submitted to support additional property tax deductions for 1979, in the amounts of $ 7,433.24 and $ 613.06, have been previously submitted to and allowed by respondent. [15]
*371 With respect to 1980 real estate taxes, petitioners have offered into evidence two canceled checks made payable to the county tax collector which total $ 1,240.14 and indicate that they pertain to the Lincoln Avenue property. Petitioners deducted $ 4,866 on Schedule A for real estate taxes in 1980. Petitioners have provided no evidence that the $ 1,240.14 in real estate taxes on the Lincoln Avenue property is not included in the $ 4,866 deducted on Schedule A of petitioners' 1980 return. With respect to 1981, petitioners have introduced as evidence canceled checks, a receipt, and a tax invoice reflecting payment of tax on their mobile home (property #11) in the amount $ 140 and on the Lincoln Avenue property in the amount of $ 627.08. Again, petitioners have failed to demonstrate that these amounts were not otherwise included in the $ 3,021 deduction for real estate taxes on their return for that year. Based on the foregoing, petitioners have failed to prove that they are entitled to additional deductions for Schedule A real estate taxes paid. Petitioners have also submitted documentation reflecting payment in 1980 of $ 1,183 in "Plumber's Union" dues and $ 319 for return preparer *372 fees. However, Schedule A of petitioners' 1980 Federal income tax return already reflects a deduction of $ 1,183 in union dues and $ 319 in tax preparation fees. Similarly, petitioners have submitted documentation for payment in 1981 of "Plumber's Union" dues of $ 1,238, which amount is already reflected as a deduction on their 1981 return. Petitioners also argue that they incurred business expenses in excess of those claimed on their returns for the years in issue in the amounts of $ 13,887.79 in 1979, $ 36,757.63 in 1980, and $ 48,657.43 in 1981. In support, petitioners have introduced hundreds of receipts, register tapes, and canceled checks which purportedly document business expenses. Petitioners have provided no explanation of how they arrived at the amounts which they claim as additional business expenses or how the documents upon which they rely support those figures. Petitioners admit on brief that "It is unclear how some of petitioner's receipts at first glance relate to a business expense. Notwithstanding, every receipt has a valid explanation." However, petitioners have failed to provide this Court with such explanations. The documentation itself undermines petitioners' *373 position. Much of the expense documentation consists of receipts for gasoline and diesel fuel for both on- and off-road use. There are also several receipts for vehicle repair and tire purchases. Most of the receipts do not indicate who the purchaser was or for what purpose the gas, tires, or repairs were purchased. Those receipts that do name the purchaser are generally in the name of APEZ, not petitioner. Petitioners state on brief that "These expenses were necessary to carry on the business of using heavy equipment and were reasonable in light of the heavy equipment used." Even if petitioners had proven that they, in fact, paid these expenses, they have not shown that the expense of operation and maintenance of heavy equipment was related to the leasing business of Avery Enterprises or to petitioner's employment by APEZ or CLS. APEZ' underground construction business required the use of heavy equipment. Consequently, it appears likely that this documentation pertains to expenses of APEZ. The voluntary payment of corporate obligations by corporate officers, employees, or shareholders may not be deducted on the taxpayer's personal return. Noyce v. Commissioner, 97 T.C. 670, 683 (1991). *374 Included among the receipts and canceled checks for various miscellaneous items, which petitioners argue in support of their claim for additional business expenses, are: A check from petitioners' personal account made payable to "cash" in the amount of $ 2,323 with no memo or other indication as to the purpose of the payment; a receipt for carpeting installed in the Lincoln Avenue property, which was charged to CLS; a receipt issued to Mrs. Avery for a velvet love seat and "tub chair" from Montgomery Ward; and canceled checks from petitioners' personal accounts to various life insurance companies. Petitioners have provided this Court with no explanation as to which trade or business these expenditures pertain or as to the ordinary and necessary character of these expenditures. Petitioners finally contend that they are entitled to deductions for bad-debt losses of $ 52,348 in 1980 and $ 16,700 in 1981 for loans to APEZ, as well as $ 131,540 in 1981 for loans to CLS. A taxpayer is entitled to report as an ordinary loss any business bad debt to the extent of its worthlessness during the taxable year. Sec. 166(a). Petitioners have the burden to establish, inter alia, the following: *375 (1) The existence of a bona fide debt; (2) the amount of the debt; (3) that the debt was incurred in or was either created or acquired in connection with the taxpayer's trade or business; and (4) that the debt became worthless at least in part during the taxable year. Rule 142(a); sec. 166(a), (d)(2); secs. 1.166-1(a), (c), 1.166-5(a)(2), Income Tax Regs.
Petitioners have not offered evidence sufficient to prove the existence of any of these requirements. As to the existence of a bona fide debt, petitioners have introduced written documents purporting to be shareholder consents to borrowing from petitioner by APEZ and CLS. However, none of the offered documents are executed. Petitioners have also offered canceled checks from petitioner to APEZ with notations on the checks that they are loans. However, as the combined total of these checks is $ 7,000, they plainly do not support loans of the magnitude asserted by petitioners, nor is petitioners' label or characterization of the purpose of those checks determinative. Petitioners seek to establish the amounts of the debts outstanding by reference to the consolidated corporate tax returns of APEZ and CLS for their taxable years *376 ended October 31, 1981 and 1982. In light of the demonstrated unreliability of petitioners' personal returns, we cannot rely on the accuracy of the corporate returns. Petitioners did not introduce corporate books and records that establish that loans were made and were outstanding in the amounts claimed. Petitioners have also failed to establish the worthlessness of the purported loans. Worthlessness is a question of fact, which the taxpayer has the burden of proving by a preponderance of the evidence. Crown v. Commissioner, 77 T.C. 582, 598 (1981). The worthlessness of a debt must be determined by an examination of all the circumstances. Dallmeyer v. Commissioner, 14 T.C. 1282, 1291 (1950). Circumstances such as the solvency of the debtor and efforts to collect the debt have been considered in determining the worthlessness of a debt. At trial, petitioner testified that, in July 1981, when the Internal Revenue Service commenced its audit, his "business just kind of fell away to nothing", that "the bank withdrew my line of credit", and "my business just kind of dried up." We fail to see how an alleged downturn in *377 petitioner's business in 1981 supports a bad-debt deduction in 1980. While the corporations' return for the taxable year ending October 31, 1981, reflects outstanding loans from stockholders of $ 52,348, that is a consolidated figure representing loans to APEZ in the amount of $ 7,000 and to CLS in the amount of $ 45,348. [16] Comparison of the balance sheets from the beginning and end of the taxable year shows a reduction in the amount of stockholder loans outstanding from $ 52,348 to $ 49,848 and an increase in unappropriated retained earnings from $ 114,515 to $ 121,223. This appears directly contrary to petitioners' assertion of the worthlessness of the purported loans to APEZ in 1980. Petitioners' claim to a bad-debt deduction of $ 16,700 from APEZ in 1981 stems from *378 a purported increase in loans from stockholders over the course of the 1981 corporate taxable year, which begins November 1, 1981 and ends October 31, 1982. [17] Petitioners have not established this increase took place during the first 2 months of the corporate tax year that falls within petitioners' 1981 taxable year. Furthermore, the fact that petitioners made additional loans to APEZ in 1981 and 1982 casts further doubt on the claimed worthlessness in 1980 of prior loans to APEZ. With respect to the claimed bad debt to CLS, petitioners state on brief that "the highest amount owed by California Land & Sea, Inc. to petitioners for the 1981 tax year was $ 131,540." The consolidated corporate return for the taxable year ending October 31, 1982, contains a statement pertaining to CLS that the "highest amount owed to taxpayer" was $ 131,540. The "taxpayer" is APEZ, not petitioners. Furthermore, the amount reflected in the consolidated *379 year end balance sheets attached to the return shows "loans from stockholder" as of October 31, 1982, representing $ 31,700 in loans to APEZ and $ 37,348 to CLS. This indicates that if there ever was a loan from petitioners to CLS of $ 131,540, it was substantially repaid during the taxable year ended October 31, 1982. Therefore, to the extent we were to rely on these returns, they militate against a finding of worthlessness of the purported debt. Petitioners have failed to establish their entitlement to a bad-debt deduction or any other offsetting deductions. Issue 3. Capital Gain on Sale of Lincoln Avenue Property
In 1971, petitioners owned undeveloped real property located at 4511 Lincoln Avenue, Oakland, California (the property). In May 1972, petitioners acquired a building permit for the property from the City of Oakland that listed the "Valuation of Proposed Work" at $ 30,000. Petitioners subsequently commenced construction of a home on one-half of the acreage of the property (the Lincoln Avenue property). Construction of the house was completed in 1974. In March 1978, petitioners sold the undeveloped one-half of the property for $ 16,500. On September 12, 1979, *380 petitioners sold the Lincoln Avenue property, including the house they constructed, for $ 195,000, of which $ 50,000 was received in downpayment. In September 1980, petitioners repossessed the Lincoln Avenue property. Section 1001(a) provides that the gain from the sale of property shall be the excess of the amount realized therefrom over the adjusted basis. The adjusted basis for determining the gain from the sale of property is the basis prescribed by section 1012 adjusted as provided in section 1016. Sec. 1011(a). The basis of property is, in general, the cost of the property. Sec. 1012. An adjustment to basis is made for the cost of improvements and betterments made to the property. Sec. 1016(a)(1); sec. 1.1016-2(a), Income Tax Regs.
Petitioners claimed a basis in the Lincoln Avenue property of $ 179,500 for computation of capital gain. The parties agree that petitioners' basis in the land is $ 19,642.55. Respondent has allowed petitioners an increase in basis for improvements to the land in the amount of $ 632.22. The parties have also stipulated that construction costs were $ 51,383.27. Respondent contends on brief that the proper adjusted basis of the house and *381 the property for computing gain on sale is $ 71,658.04, computed as follows: Total land cost
[1] $ 20,274.77
Stipulated costs of construction of house
51,383.27
Total
$ 71,658.04
Petitioners do not concede that the stipulated costs represent the total cost of construction. However, they produced no records to document additional costs of construction. In an effort to establish their claimed cost basis in the Lincoln Avenue property, petitioners presented the construction cost estimate of Kenneth W. Marquardt, a general building contractor and participant in the construction of the house on the Lincoln Avenue property. Mr. Marquardt's estimate contains two different figures for total construction costs: $ 161,972 and $ 157,500. The page containing the higher estimate is dated February 28, 1982, and the lower estimate is dated August 24, 1983. The report contains no explanation as to the difference in the estimates, nor does the report contain any *382 plans, specifications pertaining to the property, or description of the methodology Mr. Marquardt used in making his estimate. At trial, Mr. Marquardt testified that he arrived at the $ 161,972 bid by reviewing the actual plans of the house and obtaining prices for materials by using a contractor cost-estimate book and by calling suppliers. Neither petitioners nor Mr. Marquardt provided copies of the plans for the house or additional documentation of construction expenditures. Mr. Marquardt did not testify, and his report does not state, whether the prices used in his $ 161,972 estimate were 1972 or 1982 prices. The $ 157,500 estimate made over a year after the $ 161,972 estimate, states that it represents the cost of construction "in the year 1972". There was no testimony as to whether this $ 4,000 differential allegedly reflects the appropriate discount to 1972 prices. In light of the lack of explanation of his methodology, sources of information, and timeframe for his estimates, we are not prepared to accept Mr. Marquardt's estimate. Respondent's determination is normally entitled to a presumption of correctness, and petitioners have the burden of proving that determination *383 erroneous. Rule 142(a). Petitioners have failed to prove that respondent's determination is erroneous. However, for purposes of proving the existence of an underpayment of tax due to fraud for purposes of sections 6501(c) and 6653(b), if respondent is to rely on this adjustment to petitioners' basis, it is respondent who must prove that petitioners claimed an excessive basis. Respondent has not affirmatively proven that petitioners overstated the basis of the Lincoln Avenue property. Issue 4. Gain Realized on Repossession of Lincoln Avenue Property
Section 1038 provides that if a sale of real property gives rise to a debt secured by the property sold, and the seller repossesses the property in satisfaction of the debt, no gain will result except to the extent that the amount of payments received prior to the reacquisition exceeds the amount of income reported by the seller prior to the reacquisition. Conners v. Commissioner, 88 T.C. 541, 547 (1987). Such gain on repossession shall not exceed the amount by which the price at which the property was sold exceeded its adjusted basis. Sec. 1038(b)(2). Petitioners reported a long-term capital *384 gain on repossession for 1980 in the amount of $ 4,704, which they claim is correct. Respondent, on the other hand, reduced petitioners' 1980 longterm capital gain on repossession to $ 3,600 as a result of the adjustment that respondent made for 1979. Thus, respondent's position with respect to 1980 is that petitioners overreported income from the repossession, and respondent has neither alleged nor attempted to prove facts in order to establish that petitioners underreported gain on repossession. Respondent's section 1038 adjustment is simply a correlative adjustment based on respondent's determination for 1979. Because we find that the 1979 adjustments are barred by the statute of limitations, see infra, there is no foundation for respondent's section 1038 determination for 1980. Issue 5. Addition to Tax for Fraud
In order to establish petitioner's liability for fraud, respondent bears the burden of proving by clear and convincing evidence that: (1) An underpayment of tax exists for each of the years in issue, and (2) that some portion of each underpayment is due to fraud. Sec. 7454(a); Rule 142(b); Petzoldt v. Commissioner, 92 T.C. 661, 698-699 (1989); *385 Hebrank v. Commissioner, 81 T.C. 640, 642 (1983); Habersham-Bey v. Commissioner, 78 T.C. 304, 311 (1982). To meet this burden, respondent must show that petitioner intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983). The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud may be proven by circumstantial evidence and reasonable inferences drawn from proven facts because direct proof of a taxpayer's intent is rarely available. Spies v. United States, 317 U.S. 492 (1943); Rowlee v. Commissioner, supra.
Respondent relies primarily upon petitioner's failure to report rental income in order to establish fraud. The parties have stipulated amounts of unreported gross rental income *386 received with respect to various rental properties in each of the years in issue. Based upon the parties' stipulations, petitioners received rent that they failed to report in the amounts of $ 7,984.68 in 1979, $ 10,100.38 in 1980, and $ 13,716.95 in 1981. [18] Beyond that, respondent has established, by means of documentary evidence and testimony, additional unreported gross rental income received by petitioners in the years at issue. It is well settled that, once respondent has established receipts in excess of those reported on a taxpayer's return, the taxpayer bears the burden of coming forward with the evidence of costs, expenses, and other factors that would lessen his tax liability. Elwert v. United States, 231 F.2d 928, 933 (9th Cir. 1956); United States v. Bender, 218 F.2d 869, 871-872 (7th Cir. 1955); Bourque v. Commissioner, T.C. Memo. 1980-286. At trial, petitioners submitted canceled checks *387 and receipts in an attempt to prove their entitlement to additional unclaimed deductions. Many of the canceled checks and receipts reflect payments and purchases of items clearly unrelated to petitioner's business or rental activity and which appear, more often than not, to have been paid by one of petitioner's corporations. Except for the additional unclaimed expenses, which the parties have stipulated, petitioners have failed to prove that they had any additional costs or deductions with which to offset their unreported income. Respondent has proven by clear and convincing evidence the existence of underpayments of tax for the 1980 and 1981 taxable years. For each of these years, the stipulated unreported rents alone are sufficient to give rise to an underpayment of tax in each year. See appendix B. In addition, respondent has also proven that petitioners received unreported rents in excess of those which petitioners stipulated. [19]
*388 With respect to the 1979 taxable year, respondent has not proven by clear and convincing evidence that an underpayment of tax exists. On their 1979 return, petitioners reported a negative taxable income of $ 21,015. A large component of respondent's overall adjustment to petitioners' reported income for 1979 consists of an increase in capital gain on the sale of the Lincoln Avenue property. This capital gain adjustment results from respondent's disallowance of cost basis for construction expenditures, which petitioners claimed on their return but failed to substantiate. However, as previously explained, respondent has not affirmatively proven that petitioners overstated their cost basis. Therefore, this adjustment may not be considered in determining whether respondent has clearly proven the existence of an underpayment of tax for purposes of section 6653(b). Rule 142(b). Even though the parties have stipulated that petitioners had unreported rental income in 1979 and respondent has shown by clear and convincing evidence that petitioners had some unreported rental income in 1979, in addition to the amounts stipulated, the cumulative effect does not establish by clear and convincing *389 evidence the existence of an underpayment of tax for 1979. [20]
Having proven an understatement for 1980 and 1981, respondent must also prove that some portion of the understatement was due to fraud. Fraudulent intent may be inferred from a pattern of conduct. Spies v. United States, 317 U.S. at 499. *390 A pattern of consistent underreporting of income, especially when accompanied by other circumstances showing an intent to conceal, justifies the inference of fraud. See Holland v. United States, 348 U.S. 121, 137 (1954); Otsuki v. Commissioner, 53 T.C. 96, 108 (1969). Fraud may also be inferred where a taxpayer makes false and inconsistent statements to revenue agents. Grosshandler v. Commissioner, 75 T.C. 1, 20 (1980). Similarly, understated income, inadequate records, implausible or inconsistent explanations of behavior, concealment of assets, and failure to cooperate with tax authorities are all indicia of fraud. Bradford v. Commissioner, 796 F.2d 303 (9th Cir. 1986), affg. T.C. Memo. 1984-601. The record in this case is replete with evidence of petitioner's intent to evade taxes. Petitioners had been audited for years prior to 1979. At least one of these audits pertained to the income from their rental properties. During that audit, petitioner was made aware that his records were inadequate. Petitioner testified at trial *391 that he kept records for his rental properties during the years in issue, specifically a checklist for recording payment of rent, and a rental payment receipt book. Nevertheless, petitioner failed to produce records of rent received. By contrast, petitioners' tenants have been able to supply respondent with considerable documentation of rent paid and repair expenses. Among the exhibits contained in the record are receipts for rent paid with respect to four of the properties. In addition, Ms. Isaacson and Mr. Milam testified that on those occasions when they paid their rent in cash, petitioner would write them a receipt out of his receipt book. By way of explanation of his failure to produce records of rent received, petitioner offered evidence that he was extremely disorganized in his recordkeeping. Mr. Steve Hallgrimson, an attorney who had done work for petitioners in the 1970's, testified that petitioner kept records in the trunk and back seat and on the dashboard of his car, as well as in his house, and that petitioner's major recordkeeping difficulty was with respect to his rental properties. [21] Mr. Hallgrimson advised petitioner to keep better records. Petitioner similarly *392 testified that he kept records in his car and at home in folders or on top of his dresser. According to petitioner, his recordkeeping was further disrupted by a home burglary in 1978 and several burglaries at his place of business since that time. Petitioner was unable to recall if particular documents were lost or destroyed in those burglaries or in what specific years the burglaries occurred. Petitioner's explanation is not persuasive. Respondent has demonstrated petitioner's consistent pattern of underreporting rental revenues by substantial amounts over all 3 years in issue. Holland v. United States, supra at 137-138; Merritt v. Commissioner, 301 F.2d 484, 487 (5th Cir. 1962), affg. T.C. Memo. 1959-172. Petitioner frequently reported less than half the amount of rent actually received on particular properties. Petitioner's *393 consistent pattern over at least the 3 years in issue, as well as specific instances of underreporting, militate against a finding of mere negligence. For example, petitioner underreported, by nearly half, the rent received from Mr. Gillette for each year in issue despite the fact that he was a long-term tenant who always paid his rent in a timely manner. Similarly, petitioner completely omitted $ 9,000 rent in each year at issue received from Puett-Bayshore. Petitioners did not report any rental income from property #11, but claimed deductions for depreciation of the mobile home in all 3 years. Petitioners also failed to report hundreds of dollars of interest income in all 3 years in issue. Petitioners grossly overstated deductions for interest expenses on their 1979 and 1980 returns, claiming deductions of $ 9,576 and $ 8,962, respectively, to which they now agree that they are not entitled. See e.g., Drobny v. Commissioner, 86 T.C. 1326, 1349-1351 (1986). In addition, petitioner gave false and misleading answers to the Government during the investigation of their tax liabilities. Petitioners' returns for the years in issue initially came under *394 examination in 1981. The examination was subsequently referred to the Criminal Investigation Division of the Internal Revenue Service (CID). The investigation focused on omitted rental income for the years in issue. On November 13, 1984, Special Agent Larry Murphy of the CID met with petitioners and their attorney regarding petitioners' 1979, 1980, and 1981 tax years. In the course of the interview, petitioners told Special Agent Murphy that the numbers reflected on their tax returns for the rental properties were taken from a summary sheet they received from someone with whom they were in partnership with respect to the properties. Approximately 1 month later, petitioners' attorney informed Special Agent Murphy that petitioners had no partner with respect to the rental properties. As a result of the criminal investigation, petitioner was indicted, and after a trial by jury, convicted of two counts of knowingly making false income tax returns containing material omissions of rental income for the years 1980 and 1981. [22] While petitioner's criminal conviction under section 7206(1) does not collaterally estop him from denying that he fraudulently understated his tax liability *395 for 1980 and 1981, it is evidence to be considered by the trier of fact. Wright v. Commissioner, 84 T.C. 636 (1985). The convictions establish that petitioner knowingly filed false returns understating gross income from his rental properties. Fed. R. Evid. 803(22). Though not dispositive, we find this evidence highly persuasive that petitioner intended to evade taxes in 1980 and 1981. We find that there is ample evidence of intent to evade tax for the years 1980 and 1981. Respondent has proven fraud with respect to the 1980 and 1981 taxable years by clear and convincing evidence. *396 Issue 6. Statute of Limitations
The notice of deficiency was mailed more than 3 years from the respective dates on which the 1979, 1980, and 1981 returns were filed. Respondent's only defense to the bar of the 3-year statute of limitations contained in section 6501(a) is the exception for fraud contained in section 6501(c). Respondent has not proven by clear and convincing evidence that there was an underpayment due to fraud for the year 1979. Therefore, the statute of limitations bars the assessment of any deficiency and addition to tax for 1979. Because respondent has proven that some part of the underpayment for 1980 and 1981 is due to fraud, the assessment of deficiencies and additions to tax for those years is not barred. See sec. 6501(c). Decision will be entered under Rule 155. APPENDIX A
1979
1980
1981
Property #1
Rent received
$ 2,375 $ 4,356.50 $ 3,600 Rent reported
(760)
(1,200)
(2,400)
Rent unreported
1,615 3,156.50 1,200 Property #2
Rent received
2,400 2,875 3,350 Rent reported
(900)
(1,200)
(1,600)
Rent unreported
1,500 1,675 1,750 Property #3
Rent received
2,075 2,450 3,125 Rent reported
(1,400)
(1,200)
(1,500)
Rent unreported
675 1,250 1,625 Property #4
Rent received
2,776 3,261 3,576 Rent reported
(2,000)
(2,000)
(2,400)
Rent unreported
776 1,261 1,176 Property #5
Rent received
3,178.28 3,900 4,699.25 Rent reported
(1,200)
(1,200)
(1,800)
Rent unreported
1,978.28 2,700 2,899.25 Property #6
Rent received
2,050 3,192.88 3,841.95 Rent reported
(1,500)
(1,500)
(1,600)
Rent unreported
550 1,692.88 2,241.95 Property #7
Rent received
1,200 1,200 1,400 Rent reported
(1,200)
(1,200)
(1,400)
Rent unreported
0 0 0 Property #8
Rent received
3,300 3,795 4,500 Rent reported
(1,800)
(1,800)
(2,400)
Rent unreported
1,500 1,995 2,100 Property #9
Rent received
14,120 14,037.50 14,000 Rent reported
(5,100)
(5,000)
(2,500)
Rent unreported
9,020 9,037.50 11,500 Property #10
Rent received
4,800 15,000 5,000 Rent reported
(2,700)
(5,000)
(2,500)
Rent unreported
2,100 10,000 2,500 Property #11
Rent received
1,800 1,520 1,450 Rent reported
-- -- -- Rent unreported
1,800 1,520 1,450 Total unreported rents
$ 21,514.28 $ 34,287.88 $ 28,442.20 *397 APPENDIX B
Stipulated Rents
1979
1980
1981
Property #2
Rent received
$ 1,000 $ 2,8875 $ 3,350 Rent reported
(900)
(1,200)
(1,600)
Rent unreported
100 1,675 1,750 Property #3
Rent received
2,075 1,900 2,625 Rent reported
(1,400)
(1,200)
(1,500) Rent unreported
675 700 1,125 Property #5
Rent received
2,439.68 Rent reported
(1,200)
-- -- Rent unreported
1,239.68 Property #6
Rent received
2,050 3,192.88 3,841.95 Rent reported
(1,500)
(1,500)
(1,600)
Rent unreported
550 1,692.88 2,241.95 Property #8
Rent received
3,300 3,795 4,500 Rent reported
(1,800)
(1,800)
(2,400)
Rent unreported
1,500 1,995 2,100 Property #9
Rent received
9,020 9,037.50 9,000 Rent reported
(5,100)
(5,000)
(2,500)
Rent unreported
3,920 4,037.50 6,500 Total stipulated unreported
rental receipts
$  7,984.68 $ 10,100.38 $ 13,716.95 Stipulated adjustments
Interest income
328 498 319 Interest expenses
9,576 8,962 -- Depreciation
(690)
(690)
(690)
Property tax
(613.06)
-- -- Additional deductions allowed
in notice of deficiency
Rental expense --
99 Carnegie Drive
(489)
-- -- Property taxes
(7,433)
-- -- Total adjustments
$  8,663.62 $ 18,870.38 $ 13,345.95 Taxable income per return
(21,015)
(999)
29,507 Corrected taxable income
per stipulated adjustments
$ (12,351.38)
$ 17,871.38 $ 42,852.95 *398 Footnotes
1. The parties have stipulated the following: Petitioners underreported interest income in the amounts of $ 328, $ 498, and $ 319, for the respective taxable years in issue, as determined in the notice of deficiency. Petitioners are entitled to depreciation deductions, in excess of that allowed in the notice of deficiency, in the amount of $ 4,878 for each of the taxable years in issue. (In the notice of deficiency, respondent allowed only $ 316 of the $ 4,504 depreciation deduction with respect to property #10. Pursuant to the foregoing stipulation, petitioners are entitled to $ 690 depreciation in addition to the $ 4,504 previously deducted by petitioners on their returns. ($ 316 + 4,878 = $ 5,194. $ 5,194 - 4,504 = $ 690) Petitioners overreported interest expenses in the amounts of $ 9,576 and $ 8,962 for the taxable years 1979 and 1980 as determined in the notice of deficiency. Petitioners are entitled to additional Schedule A, property tax expenses for the 1979 tax year, in the amount of $ 7,433 as reflected in the notice of deficiency. Petitioners are entitled to additional, Schedule A, property tax expenses for the 1979 tax year, in the amount of $ 613.06, which amount is in addition to the amount currently reflected in the notice of deficiency as stipulated in the previous paragraph.↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
3. In the notice of deficiency, respondent determined the addition to tax for fraud only with respect to Preston M. Avery.↩
4. The bar of the statute of limitations was raised in the petition. Respondent's answer does not dispute the fact that the notice of deficiency was mailed after the normal 3-year period of limitations. Respondent's answer relies solely on the fraud exception contained in sec. 6501(c). Neither party specifically addressed the statute of limitations issue on brief.↩
5. In fact, the first three of the four receipts offered by petitioners show that petitioners received rent for 1978 in 1979; therefore, as cash method taxpayers, they would have rental income for 1979 in excess of that determined by respondent.↩
6. See fraud discussion, infra↩.
7. Respondent's calculation allows petitioners an offset of $ 800 per year to take into consideration Mr. Layer's previous testimony concerning reductions in rent for repairs he made to rental properties. Respondent's calculation was made as follows: 1979: (12 months x $ 298) - $ 800 = $ 2,776 1980: (7 months x $ 298) + (5 months x $ 395) - $ 800 = $ 3,261 1981: (12 months x $ 395) - $ 800 = $ 3,940↩
8. At trial, respondent attempted, unsuccessfully, to refresh Mr. Milam's memory with the affidavit as to the exact amounts of rent paid in the years at issue. Respondent then offered the affidavit into evidence. No objection was raised by petitioners.↩
9. Petitioner did not deposit the 1980 check from APEZ until 1981. Checks, such as this one, are seen as the equivalent of cash and thus constitute income in the year received as long as the check is not subject to some restriction when received and the check is subsequently honored. See Baxter v. Commissioner, 816 F.2d 493 (9th Cir. 1987), affg. in part and revg. in part T.C. Memo. 1985-378; Kunze v. Commissioner, 19 T.C. 29 (1952), affd. 203 F.2d 957 (2d Cir. 1953); Kahler v. Commissioner, 18 T.C. 31↩ (1952). Petitioners make no argument on brief that this payment is properly includable in income for any year other than 1980.
10. During an audit of APEZ's corporate return for the taxable year ending October 1980, it was purportedly discovered that while APEZ took a deduction for rental expense of $ 15,000 in 1980, petitioners did not include that amount in income on their personal return. APEZ's corporate return for this year is not in evidence. In an effort to resolve the civil audit of APEZ's taxable year ending October 1980, petitioner agreed to include the difference in personal income for 1980.↩
11. These amounts are based on affirmative evidence and↩ on the failure of petitioners to meet their burden of disproving respondent's determinations. As discussed in the portion of the opinion dealing with respondent's fraud allegations, the amounts which respondent has proven by clear and convincing evidence are somewhat less.
12. Respondent also argues on brief that petitioners received $ 7,500 in unreported equipment rentals from APEZ and Edwards Wood Products, Inc., in 1980. Respondent argues on brief that the evidence reflects receipt by petitioners of unreported gross receipts from equipment rental in 1979 and 1980 in the amounts of $ 2,100 and $ 7,500, respectively. Respondent did not make a determination with respect to the receipt of this income in the notice of deficiency, nor does respondent's answer contain any assertion that petitioners received additional equipment rental income. Furthermore, this issue was not raised at the beginning of the trial, at which time the Court and the parties delineated all issues to be tried. Therefore, we do not consider this matter properly before the Court and we do not address it.↩
13. Petitioners have shown by canceled checks that they paid $ 92.40 in 1981 for waste removal from property #5. Petitioners deducted only $ 84 of miscellaneous expense for that property on their return for the year. However, petitioners also deducted $ 84 in miscellaneous expense with respect to each of the other rental properties in 1981. Petitioners have not otherwise substantiated the $ 84 of miscellaneous expense for each of the other properties, nor have they demonstrated that the costs represented by the canceled checks and receipts are not already reflected in the deductions taken for 1981.↩
14. Petitioners have provided this Court with no other information regarding the Bethel Island property, but the tax statements list petitioners as the persons to whom the tax on the property was assessed.↩
15. See supra↩ note 1.
16. CLS is a wholely owned subsidiary of APEZ, and there are outstanding loans from the parent of CLS reflected on the balance sheets. Consequently, while it is unclear, we assume the "stockholder" to be petitioners for purposes of this analysis.↩
17. The entire amount is reflected in the increase of loans from stockholders to APEZ.↩
1. Respondent does not argue on brief and, consequently, apparently abandons any contention that petitioners must allocate a portion of the basis to the 1978 sale of the undeveloped one-half of the property.↩
18. See appendix B.↩
19. See previous discussion of unreported rental income. Because the stipulated unreported rents are sufficient to clearly establish an underpayment of tax for 1980 and 1981 for purposes of proving fraud, we need not elaborate on the specific additional amounts of unreported rents which respondent has affirmatively proven.↩
20. The adjustments to income for 1979 are as follows: Taxable income per return
$ (21,015.00)
Stipulated adjustments
Interest income
328.00 Interest expenses
9,576.00 Depreciation
(690.00)
Property tax
(613.06)
Additional deductions allowed
in notice of deficiency
Rental expense-99 Carnegie Drive
(489.00)
Property taxes
(7,433.00)
Total
$ (20,336.06)
Stipulated unreported rent
7,984.68 Corrected taxable income per
stipulated adjustments
$ (12,351.38)
Even if we found respondent had proven the additional $ 13,529.60 of unreported rent per our findings by clear and convincing evidence, petitioners' taxable income would be below the minimum taxable amount required to generate a tax liability.↩
21. Mr. Hallgrimson's testimony pertained to years prior to, but not including, the years in issue.↩
22. Count one of the indictment states that petitioner: did willfully make and subscribe a joint United States Individual Income Tax Return for the calendar year 1980, which was verified by a written declaration that it was made under the penalties of perjury and was filed with the Internal Revenue Service, which said income tax return he did not believe to be true and correct as to every material matter in that the said return reported $ 21,300 total gross rental receipts whereas, as he then and there well knew and believed, he had received $ 68,474 in gross rental receipts during the calendar year 1980.
Count two of the indictment makes the same charge using different amounts of receipts reported ($ 20,100) and received ($ 47,000) for calendar year 1981.↩