T.C. Memo. 2011-17

UNITED STATES TAX COURT

DANIEL D. AND DOROTHY HULTQUIST, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 12125-08.                    Filed January 24, 2011.

<u>Maris Baltins</u>, for petitioners.

<u>Catherine L. Campbell</u> and <u>Lisa M. Oshiro</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, <u>Judge</u>:  Respondent determined a $14,961 deficiency
in petitioners' 2002 Federal income tax and a $3,740 addition to
tax under section 6651(a)(1).[1]

---

[1]  All section references are to the Internal Revenue Code
in effect for the year in issue, and all Rule references are to
the Tax Court Rules of Practice and Procedure.

The issues for decision are whether petitioners are: (1) Entitled to reduce their gross receipts reported on Schedule C, Profit or Loss From Business, by cost of goods sold of $32,450[2] or, alternatively, deduct the amount as a bad debt under section 166(a); and (2) liable for a $3,740 addition to tax under section 6651(a)(1) for failure to timely file their 2002 Federal income tax return.[3]

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of facts and the attached exhibits are incorporated herein by this reference. Petitioners resided in Washington State when their petition was filed.

Daniel Hultquist (petitioner) is a college graduate who worked for a Christian mission organization in remote parts of the world for 12 years. Upon returning to the United States in

---

[2] Petitioners reported cost of goods sold of $45,144 on their 2002 Schedule C. Respondent determined that petitioners were entitled to cost of goods sold of only $7,000. Although respondent disallowed $38,144 of petitioners' reported cost of goods sold, petitioners introduced evidence only as to why they are entitled to cost of goods sold of $32,450. Because petitioners did not introduce evidence as to the remaining disallowed amount, $5,694, we treat petitioners as conceding this amount.

[3] We decline to address the merits of petitioners' alternative argument that they are entitled to a deduction for research or experimental expenditures under sec. 174(a)(1) because it was raised for the first time on brief. See Rule 34(b)(4); Messer v. Commissioner, 52 T.C. 440, 455 (1969), affd. 438 F.2d 774 (3d Cir. 1971); Solaas v. Commissioner, T.C. Memo. 1998-25 n.2.

or around 1991 petitioner established Hultquist Construction, a home construction business that he continues to operate.[4]

In early 1999 petitioner met Franklin Duncan (Mr. Duncan), who rented a house petitioner owned. Mr. Duncan showed petitioner a prototype of a tool that he had designed to make it easier to remove fishhooks and flies (i.e., artificial flies used as bait in fly-fishing) from fish. Mr. Duncan was extremely confident about the commercial prospects for this device, which he would eventually patent as the "Duncan DeHook'r" (DeHook'r). He told petitioner that he hoped to make a "million bucks within one to two years" but that he lacked the necessary capital to bring the product to market. He then asked petitioner to help him get the business started.

Later in the year petitioner and Mr. Duncan informally agreed to go into business together. Mr. Duncan agreed to focus on the design and production of the DeHook'r in exchange for petitioner's commitment to finance the project on an "as needed" basis. According to petitioner this meant that instead of giving Mr. Duncan a lump sum of capital he agreed to pay any expenses incurred.[5]

---

[4] Petitioner operates Hultquist Construction as a sole proprietorship and reports its income and expenses on a Schedule C.

[5] Mr. Duncan later showed petitioner a knot tying tool for hooks, flies, jigs, and lures that he patented as the "Duncan
(continued...)

During the initial phase of the business petitioner and Mr. Duncan never discussed how they would share the profits. Instead they focused on finalizing the product's design and determining whether there was significant demand for the DeHook'r.

By the end of 1999 Mr. Duncan and petitioner had finalized the design of the DeHook'r and hired a local manufacturer to produce 500 of them. They promoted the DeHook'r at various trade shows and received overwhelmingly positive feedback. The following year they decided to move forward with large-scale production of the DeHook'r.

On January 21, 2000, in anticipation of moving forward with the production and marketing of the DeHook'r and the TailKnott'r, petitioner formed Maiden Ventures, L.L.C. (Maiden Ventures),[6] a single-member limited liability company through which the DeHook'r and the TailKnott'r would be sold. Petitioner continued to pay expenses as they were incurred, and he gave Mr. Duncan money upon request to use "for the benefit of the company".[7]

_____

[5](...continued)
TailKnott'r" (TailKnott'r). Petitioner financed the development and production of the TailKnott'r as well as the DeHook'r.

[6] Maiden Ventures is a disregarded entity for Federal income tax purposes. See sec. 301.7701-3(b), Proced. & Admin. Regs. Consequently, petitioners reported all of Maiden Ventures' income and expenses on Schedules C and included Maiden Ventures' profits or losses on their Federal income tax returns.

[7] Petitioner's testimony was not clear in this regard. He did not explain why he gave Mr. Duncan funds directly (e.g.,

(continued...)

Petitioner hired an attorney to draft a licensing agreement that would grant him the exclusive rights to sell, market, and manufacture the DeHook'r. However, petitioner produced only an unsigned version of the agreement, and it is unclear whether it was ever executed.

Petitioner soon became troubled by inefficiencies in the production process that, in his opinion, prevented Mr. Duncan and him from earning a profit. Since petitioner was the only one infusing capital into the business, he felt that Mr. Duncan lacked sufficient motivation to address the manufacturing issues. In an effort to motivate Mr. Duncan and "t[ie] him in financially", petitioner claims that he and Mr. Duncan agreed to treat all subsequent payments to Mr. Duncan as loans.

From February 9, 2000, through July 12, 2001, petitioner issued 28 checks to Mr. Duncan totaling $32,450.[8] Petitioner wrote the following descriptions on the checks: (1) "Personal loan" (13 checks); (2) "Loan" (6 checks); (3) "Loan from MV" (1

---

[7](...continued)
whether these were out-of-pocket expense reimbursements), nor is it clear from the documents he introduced at trial. He characterized these payments as "something that [Mr. Duncan] requested and it was something that I gave him. How he used [the funds] I'm assuming was for obviously the benefit of the company. * * * It wasn't just going towards his personal [expenses] * * * whatever I gave him was for the business".

[8] Petitioner made out some of the checks to Mr. Duncan's wife as a matter of convenience when Mr. Duncan was unable to cash or deposit the checks.

check); and (4) "Loan to Duncan" (1 check). Seven checks contained no description. It is unclear from the record what Mr. Duncan did with these funds, but petitioner assumed that they were used in some way to further the business.

Petitioner did not prepare any loan documents, promissory notes, or other agreements evidencing the loans. There were no repayment schedules, maturity dates, or interest rates. Petitioner hoped Mr. Duncan would repay the $32,450 from his share of future profits.

Petitioner never earned enough money to turn a profit. He eventually stopped funding the project in late 2003 or early 2004, and Mr. Duncan decided to take his patents elsewhere. Mr. Duncan continues to market and sell the DeHook'r and the Tailknott'r for a different company.

Petitioner never attempted to recover any of the $32,450 he gave to Mr. Duncan. He explained that "getting funds from [Mr. Duncan] would be like getting water in the desert because I knew of his financial situation".

Petitioners filed their 2002 Federal income tax return late, on June 10, 2004.[9] They included with their return a Schedule C that reported Maiden Ventures' 2002 gross receipts as $43,800 and cost of goods sold as $45,144. In calculating Maiden Ventures'

_____

[9] Petitioners were granted an extension of time to file their 2002 Federal income tax return and had until Oct. 15, 2003, to timely file.

cost of goods sold petitioners reported opening and closing inventories of zero and purchases made during the year of $45,144. Petitioners, on the advice of their accountant, included the $32,450 that petitioner gave to Mr. Duncan in 2000 and 2001 as purchases made during the 2002 tax year.[10] Respondent disallowed all but $7,000 of the cost of goods sold on the grounds that petitioners failed to establish that they made purchases during the year in excess of that amount.

## OPINION

Respondent's determinations in the statutory notice of deficiency are presumed to be correct, and petitioners bear the burden of proving that respondent erred in his determinations.[11] See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

## I. Cost of Goods Sold

A manufacturing or merchandising business calculates its gross income by subtracting cost of goods sold from gross

---

[10] Petitioner used Quickbooks to keep track of the business' finances. For the period ending Dec. 31, 2002, his trial balance showed inventory of $35,067.79 and cost of goods sold of $8,370.24. Petitioner included the $32,450 he gave to Mr. Duncan in 2000 and 2001 in inventory.

Petitioner showed the trial balance to his accountant, Wesley L. Delaney (Mr. Delaney), who advised petitioner to include the inventory total in cost of goods sold. Mr. Delaney advised petitioner to do this because "[Maiden Ventures is] a cash basis taxpayer, and a cash basis taxpayer is not going to have inventory".

[11] Petitioners have neither claimed nor shown that they satisfied the requirements of sec. 7491(a) to shift the burden of proof to respondent.

receipts. Sec. 1.61-3(a), Income Tax Regs. Cost of goods sold includes the cost of items acquired for resale and the costs of producing items for resale. Sec. 1.162-1(a), Income Tax Regs. Though cost of goods sold is technically an adjustment to gross income and not a deduction, substantiation of the amounts claimed as cost of goods sold is required. See Rodriquez v. Commissioner, T.C. Memo. 2009-22. Where taxpayers do not have adequate records but the record indicates that they clearly incurred an offset to gross income, we may estimate the offset on the basis of the evidence. Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930); Jackson v. Commissioner, T.C. Memo. 2008-70.

Petitioners argue that they are entitled to include the amounts given to Mr. Duncan in 2000 and 2001 in their cost of goods sold for 2002 because the payments were made in anticipation of developing and marketing the DeHook'r and the TailKnott'r and the related costs were incurred in 2002. Respondent counters that petitioners are not entitled to include any of the $32,450 in their 2002 cost of goods sold because petitioners are cash basis taxpayers and therefore deduct expenses in the year in which they are paid. Respondent further argues that petitioners have not shown that Mr. Duncan used any of the payments to pay expenses that allow for a corresponding deduction.

Petitioners have introduced no evidence as to how Mr. Duncan used the $32,450.  In fact, petitioner testified that he is not sure how Mr. Duncan used the $32,450 although he assumes Mr. Duncan used it to further Maiden Ventures' business.  Petitioner did not obtain an accounting from Mr. Duncan of how he used the $32,450, and petitioners failed to introduce receipts or invoices showing that any of the $32,450 went towards the manufacturing of the DeHook'r or the TailKnott'r.[12]  Petitioners also failed to call Mr. Duncan to testify as to how he spent the $32,450.  The burden is on petitioners to show that the amount claimed as cost of goods sold is accurate.  Petitioner's assumption that Mr. Duncan used the money to further Maiden Ventures' business is insufficient to substantiate the $32,450 as cost of goods sold.

Additionally, we are unable to estimate an amount of cost of goods sold under the Cohan rule.  For the Cohan rule to apply, a basis must exist on which we can make an approximation.  Vanicek v. Commissioner, 85 T.C. 731, 742-743 (1985).  Petitioners have introduced no evidence that provides us with such a basis, e.g., the cost of manufacturing the DeHook'rs and the TailKnott'rs and the number manufactured in 2002.

---

[12]  We also note that petitioner wrote "loan" on most of the checks he issued to Mr. Duncan, including "personal loan" on 13 of the checks, and believe this to be contradictory to the proposition that petitioner may treat the money as a cost of goods sold.

Accordingly, we shall sustain respondent's downward adjustment to the cost of goods sold.

II.  Section 166 Business Bad Debt Deduction

Alternatively, petitioners argue that the payments to Mr. Duncan were loans and that they are entitled to a bad debt deduction under section 166(a).

Section 166(a) provides as a general rule that a deduction shall be allowed for any debt which becomes worthless within the taxable year.  Only a "bona fide" debt can be deducted, however. Sec. 1.166-1(c), Income Tax Regs.  A bona fide debt arises when a debtor-creditor relationship is formed as a result of an unconditional, valid, and enforceable obligation to pay a fixed or determinable sum of money.  Boatner v. Commissioner, T.C. Memo. 1997-379, affd. without published opinion 164 F.3d 629 (9th Cir. 1998); sec. 1.166-1(c), Income Tax Regs.  The objective indicia of a bona fide debt include a note or other evidence of indebtedness and an interest charge.  See Clark v. Commissioner, 18 T.C. 780, 783 (1952), affd. 205 F.2d 353 (2d Cir. 1953).  Also considered are the existence of security or collateral, the demand for repayment, records that may reflect the transaction as a loan, and the borrower's solvency at the time of the loan.  See Schenk v. Commissioner, T.C. Memo. 1996-113.

Petitioners have not established the existence of a bona fide debt.  Petitioner and Mr. Duncan never agreed to a repayment

schedule setting forth how often payments were to be made, nor did they specify a maturity date for the loans. Petitioner never made any demands for repayment despite the fact that he was aware that Mr. Duncan continued to sell the patented fishing accessories with another company.

We also believe that any repayment was conditional on the future success of the business. Petitioner stated that "we were hoping that [Mr. Duncan] could be paying me back each year off of the income that we were generating". We interpret petitioner's statement to mean that he expected to be repaid only if the business became profitable, which undermines the unconditional obligation requirement specified in the regulations. See sec. 1.166-1(c), Income Tax Regs. Moreover, at the time he advanced the funds to Mr. Duncan, petitioner was aware that Mr. Duncan was unemployed and had no source of income aside from any potential profits earned from their business venture.

Accordingly, we find that petitioners have not established that they are entitled to a bad debt deduction under section 166(a), and respondent's determination is sustained.

III.  Section 6651(a)(1) Addition to Tax

Section 6651(a)(1) imposes an addition to tax for failure to file a return on the date prescribed (determined with regard to any extension of time for filing), unless the taxpayer can establish that such failure is due to reasonable cause and not

willful neglect.  Respondent bears the burden of production with regard to the addition to tax under section 6651(a)(1).  See sec. 7491(c).

Petitioners' 2002 tax return was due on October 15, 2003.  They filed their return on June 10, 2004.  Petitioners have presented no evidence indicating that their failure to timely file was due to reasonable cause or that respondent's determination is otherwise incorrect.  Accordingly, petitioners are liable for the addition to tax under section 6651(a)(1).

In reaching our holdings herein, we have considered all arguments made by the parties, and to the extent not mentioned above, we find them to be irrelevant or without merit.

To reflect the foregoing,

Decision will be entered for respondent.