T.C. Memo. 2012-191

UNITED STATES TAX COURT

VITAUTAS KAZHUKAUSKAS AND VILMA KAZHUKAUSKAS, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 4657-10.                          Filed July 11, 2012.

Vitautas Kazhukauskas and Vilma Kazhukauskas, pro sese.

<u>Mindy Y. Chou</u>, <u>Robert D. Heitmeyer</u>, <u>Alexandra E. Nicholaides</u>, and Alissa

Vanderkooi (specially recognized), for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LARO, <u>Judge</u>:  Petitioners, while residing in Michigan, petitioned the Court

to redetermine deficiencies respondent determined in their 2006 and 2007 Federal

income tax of $62,860 and $33,122, respectively, and accuracy-related penalties of

$12,572 and $6,624, respectively.[1] We are asked to decide the following issues: (1) whether petitioners underreported gross receipts of $222,534 and $168,086 on their 2006 and 2007 Schedules C, Profit or Loss From Business, respectively. We hold they did; (2) whether petitioners may deduct Schedule C expenses and claim costs of goods sold in addition to those respondent allowed for 2006 and 2007.[2] We hold they may not; (3) whether petitioners owe self-employment tax for 2006 and 2007, net of deductions allowed under section 164(f), in the amounts of $8,749 and $7,672, respectively. We hold they do; and (4) whether petitioners are liable for accuracy-related penalties for 2006 and 2007 under section 6662(a) and (b)(2) for substantial understatements of income tax. We hold they are.

## FINDINGS OF FACT

Before trial, respondent's counsel sent to petitioners a proposed stipulation of facts which respondent proffered petitioners should agree to under Rule 91(a). Petitioners refused to execute the agreement, and respondent moved the Court to

---

[1]Unless otherwise indicated, section references are to the applicable version of the Internal Revenue Code, and Rule references are to the Tax Court Rules of Practice and Procedure. Some dollar amounts are rounded.

[2]Respondent allowed petitioners all trade or business expense deductions claimed on their 2006 and 2007 Federal income tax returns (2006 return and 2007 return, respectively), as well as offsets to their 2006 and 2007 gross receipts for costs of goods sold of $5,353 and $46,604, respectively.

compel stipulation under Rule 91(f). The Court granted respondent's motion and ordered petitioners to show cause why the proposed stipulation of facts, as well as the accompanying exhibits, should not be deemed established for purposes of this case. See Rule 91(f)(2). Petitioners failed to respond, and we made our order to show cause absolute by deeming established (for purposes of this case) the facts and evidence in respondent's proposed stipulation of facts.[3] See Rule 91(f)(3). Our findings of fact are primarily derived from the facts and exhibits deemed stipulated, the documents admitted at trial, and the pleadings. We find the facts and exhibits deemed stipulated accordingly.

Vitautas Kazhukauskas (petitioner) was born in Lithuania to Bronislovas Kazhukauskas (father) and Aldona Kazhukauskene (mother). He moved to the United States in 1990. Vilma Kazhukauskas (Ms. Kazhukauskas), who is a petitioner in this case, is an accountant with a bachelor's degree in budgeting that she earned overseas. Petitioners have at all relevant times been U.S. citizens, and they have two sons, including M.K. Petitioner's mother has at all relevant times lived in Lithuania, and his father was deceased at the time of trial.

---

[3]Among the facts deemed stipulated were that petitioners underreported their respective gross receipts for 2006 and 2007 by $222,534 and $168,086 and that petitioners lacked reasonable cause for failing to report those gross receipts.

During the years at issue, petitioners owned V.K. Auto Sales (VK U.S.) and V.K. Motors, UAB (VK Lithuania). Through those entities, petitioners operated an import and export business in which VK U.S. purchased used automobiles mostly at auctions within the United States and exported the vehicles to VK Lithuania for resale primarily within Lithuania. Petitioners also bought and sold used vehicles domestically through VK U.S. For the most part, VK U.S. purchased vehicles with scrap certificates of title and certificates of title specifying the automobiles were to be used for salvage purposes only.[4] Some certificates of title indicated the vehicles had been approved for export, and as discussed below, petitioners shipped numerous automobiles overseas. The record is unclear the extent to which (if at all) VK U.S. repaired the vehicles it purchased before resale.

Petitioners' books and records concerning their import and export business consisted of an amalgamation of receipts, certificates of title, and bank statements with minimal (if any) logical arrangement. As best we can tell from the disjointed record in this case, VK U.S. purchased at least 38 vehicles in 2006 and at least 30

---

[4]A scrap certificate of title signifies that the vehicle to which it relates is not to be titled or registered and is to be used for parts or scrap metal only. See Mich. Comp. Laws Serv. sec. 257.222(8) (LexisNexis 2001 & Supp. 2012).

vehicles in 2007, with a cost per vehicle ranging between $330 and $8,453.[5] The information relating to the vehicles which VK U.S. sold, as well as the proceeds received therefrom, is less clear. In its domestic operations VK U.S. sold at least 14 vehicles in 2006 and at least 17 vehicles in 2007. In its international operations VK U.S. shipped at least 32 vehicles to Lithuania during 2006 and 2007, though the number of vehicles exported and sold abroad during each year is not readily discernible from the record. VK Lithuania employed petitioner's mother as a manager or bookkeeper from May 5, 2006, through at least May 5, 2007.

Petitioners, jointly, individually, or collectively with M.K., owned at least six bank accounts with JPMorgan Chase Bank, N.A.[6] The first was a premier savings account titled in petitioners' names (personal savings account) with a balance that grew from $36,405 on December 28, 2005, to more than $334,688 on December 27, 2007. The second was a business checking account titled in the name of VK

---

[5]We examined the records submitted at trial and summarized VK U.S.' purchases using the associated vehicle identification number (VIN).

[6]Two accounts named Vilma Kazhukauskene as a joint account holder or a d.b.a. owner of VK U.S. It is our understanding that Vilma Kazhukauskene and Ms. Kazhukauskas are the same individual, and we collectively refer to both as Ms. Kazhukauskas. We note that the parties' redaction of all but the first three digits of financial account numbers prevented us from more precisely describing petitioners' accounts.

U.S. (business checking account) with a balance that fluctuated from $17,064 on December 30, 2006, to $6,796 on December 31, 2007. The third through sixth bank accounts were a blend of checking and savings accounts, both personal and business, which at all relevant times reflected a balance of $30 to $520.[7]

Throughout 2006 and 2007 VK U.S. received regular advices of credit from various parties, after which the related funds were wire-transferred into the business checking account. Many advices of credit bore the notation "skola", literally translated to mean "debt" in Lithuanian, though the word's meaning may vary depending upon the context. Specifically, petitioners received the following wire transfers during the year at issue:

| Date | Amount | From | Notation |
|------|--------|------|----------|
| Jan. 20, 2006 | $16,971.43 | Mother | Skola |
| Feb. 21, 2006 | 15,971.75 | Father | Skola |
| Mar. 22, 2006 | 17,571.38 | Father | Skola |
| Apr. 25, 2006 | 16,171.13 | Petitioner | Pervedimas |
| May 4, 2006 | 34,143.89 | Petitioner | Pavedimas |
| May 26, 2006 | 14,970.38 | Father | Skola |
| June 20, 2006 | 18,770.72 | Mother | Skola |
| Aug. 1, 2006 | 20,205.57 | Mother | Skola |
| Aug. 11, 2006 | 1,650.00 | VK Lithuania | UZ Automobilius |
| Aug. 22, 2006 | 19,270.39 | Mother | Skola |

---

[7]The record establishes that petitioners owned a bank account which earned interest income of $8,647 in 2006. Our statement of petitioners' accounts does not separately identify this account because the record is not clear that this account is not the same as the personal savings account.

| | | | |
|---|---|---|---|
| Sept. 1, 2006 | 12,620.43 | Father | Skola |
| Sept. 1, 2006 | 9,970.43 | VK Lithuania | UZ Automobilius |
| Nov. 1, 2006 | 11,970.64 | Father | Skola |
| Nov. 22, 2006 | 12,275.49 | Father | Skola |
| 2006 Total | 222,533.63 | | |
| | | | |
| Jan. 31, 2007 | $6,590.27 | Mother | Skola |
| Feb. 14, 2007 | 3,370.17 | VK Lithuania | UZ Automobilius |
| Feb. 28, 2007 | 8,938.92 | VK Lithuania | UZ Automobilius |
| Mar. 6, 2007 | 5,969.84 | VK Lithuania | UZ Automobilius |
| Mar. 15, 2007 | 16,969.96 | VK Lithuania | Skola, UZ Automobilius |
| Mar. 27, 2007 | 13,919.63 | Father | Skola |
| Apr. 2, 2007 | 17,092.67 | Father | Skola |
| May 11, 2007 | 17,719.30 | VK Lithuania | UZ Automobilius |
| June 22, 2007 | 8,635.00 | As Sampo Pank | Payment for Auto Honda |
| July 3, 2007 | 12,019.50 | Mother | Skola |
| July 30, 2007 | 5,675.00 | As Sampo Pank | Payment for Hyundai |
| Sept. 21, 2007 | 14,419.75 | VK Lithuania | UZ Automobilius |
| Oct. 9, 2007 | 12,028.57 | Petitioner | UZ Automobilius |
| Oct. 9, 2007 | 6,301.57 | VK Lithuania | UZ Automobilius |
| Nov. 7, 2007 | 12,368.08 | Father | Skola |
| Dec. 6, 2007 | 6,067.72 | Mother | Skola |
| 2007 Total | 168,085.95 | | |

Petitioners filed joint Federal income tax returns for 2006 and 2007 which Ms. Kazhukauskas prepared. The 2006 return reported interest income of $9,892, business income of $2, and total income of $9,894. Attached to the 2006 return was a Schedule C for VK U.S. reporting gross receipts or sales of $72,636, business expenses of $72,634, and zero cost of goods sold. The 2007 return reported interest income of $10,208, business income of $3, and total income of $10,211. Attached to the 2007 return was a Schedule C for VK U.S. reporting gross receipts or sales of

$66,371, business expenses of $66,368, and zero cost of goods sold. The amounts reported as business income on the 2006 and 2007 returns were, as petitioners admitted at trial and on brief, falsified to hide VK U.S.' purported bankruptcy.

On audit of the 2006 and 2007 returns, petitioners submitted to respondent bank statements, advices of credit, shipping container receipts, and a copy of petitioners' police book,[8] among other items. These records, as they related to the regularity of VK U.S.' international sales, were inconsistent in certain material respects. For example, the police book indicated that petitioners shipped overseas 21 vehicles in 2003, 42 vehicles in 2004, and 1 vehicle in each of the years 2005 through 2007. The receipts, on the other hand, showed that VK U.S. paid at least $8,100 during 2006 and $24,550 during 2007 for at least nine shipping containers sent to Lithuania--suggesting that more vehicles had been shipped than were reported in the police book.

Respondent's revenue agent Suzanne Owen was assigned to examine petitioners' returns for the years at issue. During her investigation Ms. Owen learned of VK Lithuania, a business which petitioner claimed during a meeting with her to have had no relationship to VK U.S. She analyzed bank statements

---

[8]A police book is defined under Michigan law to mean a bought and sold registry for each vehicle a dealer handles. Mich. Comp. Laws Serv. sec. 257.41a (LexisNexis 2001).

petitioners submitted and inventoried wire transfers deposited into the business checking account in a worksheet that was attached to the notice of deficiency. The worksheet demonstrated that totals of $222,534 and $168,086 were deposited into the business checking account in 2006 and 2007, respectively. Ms. Owen noted in her supporting workpapers that bank statements and related advices of credit indicated that portions of the wire transfers were from sales of vehicles abroad and in some cases included the vehicle manufacturer and VIN. Ms. Owen determined on the basis of the foregoing that petitioners had underreported their 2006 and 2007 Schedule C gross receipts by $222,534 and $168,086, respectively; i.e., all amounts wire-transferred to petitioners as gross receipts from sales of vehicles overseas were treated as income. Ms. Owen determined the most probable source of the income to be sales of vehicles overseas, on the basis of details contained in the wire transfers, the shipping container purchases, and information about the vehicles shipped overseas as sometimes recorded in the police book.

Respondent issued to petitioners a notice of deficiency determining various adjustments to their income for 2006 and 2007. First, respondent determined that petitioners' costs of goods sold were increased by $5,353 for 2006 and $46,604 for 2007. Second, respondent determined that petitioners underreported their gross

receipts for 2006 and 2007 by $222,534 and $168,086, respectively. Third, respondent determined that petitioners' self-employment taxes for 2006 and 2007 were increased by $17,497 and $15,343, respectively. Fourth, respondent determined that petitioners were entitled to self-employment tax deductions for 2006 and 2007 of $8,749 and $7,672, respectively. Fifth, respondent determined that petitioners were liable for section 6662(a) accuracy-related penalties for 2006 and 2007 for substantial understatements of income tax. Petitioners petitioned the Court under section 6213(a) for a redetermination of the deficiencies and accuracy-related penalties.

OPINION

I.    Burden of Proof

As a general rule, the Commissioner's determinations in a statutory notice of deficiency are presumptively correct, and taxpayers bear the burden of proving those determinations erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). The U.S. Court of Appeals for the Sixth Circuit, to which an appeal in this case would lie barring a written stipulation to the contrary, has stated that the Commissioner cannot rely on the presumption of correctness to support deficiency determinations of unreported income without a "'minimal evidentiary foundation'" linking the taxpayers with the income-producing activity or to the

receipt of funds.[9]  United States v. Walton, 909 F.2d 915, 919 (6th Cir. 1990) (quoting Weimerskirch v. Commissioner, 596 F.2d 358, 361 (9th Cir. 1979), rev'g 67 T.C. 672 (1977)); Richardson v. Commissioner, T.C. Memo. 2006-69, 91 T.C.M. (CCH) 981, 989 (2006), aff'd, 509 F.3d 736 (6th Cir. 2007).  Where, as here, the Commissioner carries his burden of production with respect to unreported income, the burden of proof shifts to the taxpayers to produce "credible evidence that they did not earn the taxable income attributed to them or of presenting an argument that the IRS deficiency calculations were not grounded on a minimal evidentiary foundation."  United States v. Walton, 909 F.2d at 919.  Taxpayers must prove their entitlement to deductions and losses as well as the amount of the benefit claimed.  See Gatlin v. Commissioner, 754 F.2d 921, 923 (11th Cir. 1985), aff'g T.C. Memo. 1982-489; Time Ins. Co. v. Commissioner, 86 T.C. 298, 313-314 (1986); Jordan v. Commissioner, T.C. Memo. 2009-223, 98 T.C.M. (CCH) 289, 299-300 (2009) (discussing the applicability of Walton to the payment of expenses), aff'd, ___ Fed. Appx. ___ (6th Cir. Apr. 25, 2012).

Respondent introduced ample evidence linking petitioners with the import and export business (the income-producing activity), and respondent has shown that

---

[9]While the factual allegations deemed admitted under Rule 91(f) establish that petitioners underreported their 2006 and 2007 gross receipts, respondent still must produce evidence linking petitioners with that income.

petitioners received unreported income during each year at issue. The record includes advices of credit and bank statements showing that more than $390,000 was transferred into VK U.S.' checking account from international sources. The record likewise contains certificates of title, bills of lading, and receipts showing that petitioners shipped vehicles purchased at auctions within the United States to VK Lithuania. At trial and on brief petitioners admitted that they received, but did not report, at least $110,000 from sales of vehicles in Lithuania. In view of the foregoing, we are satisfied that respondent has carried his burden of production as to the unreported Schedule C gross receipts. Accordingly, the notice of deficiency is presumed correct and petitioners bear the burden of proving otherwise.[10]

II.    Schedule C Gross Receipts

Respondent determined that petitioners underreported their 2006 and 2007 Schedule C gross receipts by $222,534 and $168,086, respectively. Petitioners acknowledge on brief that they failed to report Schedule C gross receipts for 2006 and 2007 in the respective amounts of $11,620 and $99,090 but claim additional amounts which respondent attributed to them are excludable from gross income as gifts under section 102. We will sustain respondent's determinations.

---

[10]Petitioners do not allege, and the record does not establish, that the burden of proof as to factual matters should shift to respondent under sec. 7491(a).

Taxpayers must keep sufficient records to enable the Commissioner to determine their correct Federal income tax liability. Sec. 6001; Petzoldt v. Commissioner, 92 T.C. 661, 686-687 (1989). The Commissioner is simultaneously authorized to examine books, papers, records, or other data potentially relevant or material in determining the taxpayers' Federal income tax liability. Sec. 7602(a)(1). Where taxpayers fail to keep such books and records, the Commissioner is authorized to reconstruct the taxpayers' income under any method that, in the Commissioner's opinion, clearly reflects income. Sec. 446(b); Petzoldt v. Commissioner, 92 T.C. at 693. Courts have long recognized the bank deposits method as a permissible indirect approach to reconstructing taxable income. See DiLeo v. Commissioner, 96 T.C. 858, 867 (1991), aff'd, 959 F.2d 16 (2d Cir. 1992); Estate of Mason v. Commissioner, 64 T.C. 651, 656 (1975) (and cases cited thereat), aff'd, 566 F.2d 2 (6th Cir. 1977).

Respondent's revenue agent, Ms. Owen, testified credibly that petitioners' books and records, including their inventory system, were not kept in organized fashion or in compliance with internal revenue laws. The disarray of receipts and other documents that petitioners submitted to the Court as their books and records reinforces that testimony. Accordingly, we conclude that respondent was justified in recreating petitioners' gross receipts using the bank deposits method.

Bank deposits are prima facie evidence of income. Tokarski v. Commissioner, 87 T.C. 74, 77 (1986); Estate of Mason v. Commissioner, 64 T.C. at 656. Under the bank deposits method, the Government assumes that all deposits into a bank account during any given taxable year constitute taxable income unless the taxpayers prove that the deposits originated from nontaxable sources. DiLeo v. Commissioner, 96 T.C. at 868. The Commissioner may (but need not) show a likely source of unreported income determined through the bank deposits method, though he must take into account nontaxable items or deductible expenses which he knows about. Price v. United States, 335 F.2d 671, 677 (5th Cir. 1964); DiLeo v. Commissioner, 96 T.C. at 868. Petitioners bear the burden of establishing that the bank deposits originated from nontaxable sources. See Price, 335 F.2d at 677.

It is deemed stipulated that petitioners underreported their gross receipts by $222,534 for 2006 and $168,086 for 2007. A stipulation is treated, to the extent of its terms, as a conclusive admission by the parties, unless otherwise permitted by the Court or agreed upon by the parties. Rule 91(e). The Court may permit a party to qualify, change, or contradict a stipulation upon a showing that the stipulation is contrary to facts disclosed by the record, see Jasionowski v. Commissioner, 66 T.C. 312, 318 (1976), or where justice so requires, see Rule 91(e). Petitioners have not

asked to be relieved of the deemed stipulations, and we decline to grant such relief on our own. The stipulation concerning gross receipts is not contrary to the record and, as we find, justice would be ill served were the stipulation not enforced.

Petitioners acknowledged at trial and on brief that they underreported their 2006 and 2007 gross receipts by $11,620 and $99,090, respectively. We treat those statements as conclusive and binding admissions on petitioners. See United States v. Burns, 109 Fed. Appx. 52, 58 (6th Cir. 2004) (statements made on brief may be considered judicial admissions). We thus conclude petitioners' gross receipts are increased by $11,620 for 2006 and $99,090 for 2007. As for the remaining gross receipts in controversy, i.e., $210,914 for 2006 and $68,996 for 2007 (sometimes collectively referred to as the disputed gross receipts),[11] we will give effect to the stipulation treating those amounts as gross receipts.

---

[11]To calculate the disputed 2006 gross receipts, we subtracted the amount conceded by petitioners on brief, or $11,620, from the unreported gross receipts as determined in the notice of deficiency, or $222,534. We calculated the challenged 2007 gross receipts in the same way; that is, we subtracted the amount petitioners conceded on brief, or $99,090, from the unreported gross receipts as determined in the notice of deficiency, or $168,086.

Petitioners claim that the disputed gross receipts were nontaxable gifts from petitioner's parents.[12] We are unpersuaded. Respondent asserts, and we agree, that petitioners have not submitted corroborating evidence to support their claims that any portion of the disputed gross receipts was a gift. As we find, the disputed gross receipts reflect the proceeds of business transactions entered into by VK Lithuania and subsequently remitted to petitioners. By reason of petitioners' failure to prove that the disputed gross receipts were gifts and not proceeds from VK Lithuania, we conclude that justice disfavors allowing petitioners to contradict the stipulations.

Section 102(a) allows taxpayers to exclude from gross income the value of property acquired by gift, bequest, devise, or inheritance. The Supreme Court has defined a gift for statutory purposes as a transfer of property that proceeds from a "detached and disinterested generosity, out of affection, respect, admiration, charity or like impulses." Commissioner v. Duberstein, 363 U.S. 278, 285 (1960) (internal citations and quotation marks omitted). The donor's intent is of critical import in deciding whether the property transferred was a gift. Id. at 285-286. Such intent is often outcome determinative because a gift is not recognized as complete until the

---

[12]Notwithstanding the literal translation of "skola" to mean debt, petitioner testified on direct at trial that there was not a loan between him and his mother.

donor has evinced a clear and unmistakable intention to transfer sufficient dominion and control of the property irrevocably and absolutely. Guest v. Commissioner, 77 T.C. 9, 16 (1981) (quoting Weil v. Commissioner, 31 B.T.A. 899 (1934), aff'd, 82 F.2d 561 (5th Cir. 1936)).

Applying those considerations to this case, we decline to recognize any of the disputed gross receipts as nontaxable gifts. With respect to wire transfers from petitioner's mother, all of which bore the notation "skola", petitioner testified that his mother used the word "skola" to intimate that she expected to be repaid if she needed the funds, and only if no such need arose would the transfer be considered a gift.[13] By petitioner's own admission, therefore, his mother did not relinquish dominion and control of the funds. Rather, she conditioned petitioner's enjoyment of the funds on her not asking to be repaid--a condition uncertain to be met until the sooner of her death or the removal of the condition. That condition precludes our recognizing transfers from petitioner's mother as gifts for Federal income tax purposes because the gift was not certain to be completed. With regard to wire transfers from petitioner's father, all of which were similarly designated "skola",

---

[13]Petitioner's specific testimony was: "The money was given to me and because of that she felt--in case if she need those monies back she put the word, skola, meaning that I be owing to her in case if she needs [it]. If not this will be as a gift."

petitioners presented no evidence to suggest his father's use of the word did not connote an expectation of repayment should the need arise. In this regard, we are not persuaded that wire transfers from petitioner's father were completed gifts in 2006 or 2007.[14]

We are skeptical for additional reasons that amounts wire-transferred to petitioners were gifts. Petitioners each testified that petitioner's parents wire-transferred the disputed gross receipts to them for the support, care, and education of petitioners' children. Although petitioner's father was unavailable to testify on the matter, we have no reason to believe that petitioner's mother was unavailable to be called as a witness. Insofar as petitioner's mother was not called to testify to her intent at the time of each transfer and her use of the word "skola", we conclude such testimony would be damaging to petitioners. See McKay v. Commissioner, 89 T.C. 1063, 1069 (1987) (witness' failure to testify to facts peculiarly within his knowledge suggests the testimony would be unfavorable), aff'd, 886 F.2d 1237 (9th Cir. 1989). Nor did petitioners explain why moneys transferred allegedly to support their children were deposited into the business checking account and not, for

---

[14]Although the record establishes that petitioner's father was deceased at the time of trial, the record does not specify whether he died in 2007. On this subject, we are unable to discern whether purported gifts from the father were completed in 2007, in which case these amounts may have been nontaxable to petitioners, or at some point thereafter. This failure of proof is borne by petitioners.

example, one of petitioners' personal accounts. In the same regard, petitioners did not explain why their claimed need for support was not met by the more than $300,000 of savings which they had collected over the years. Given that many of the transfers originated with petitioner's mother, who was also VK Lithuania's bookkeeper, we question the donative nature of the transfers. See Commissioner v. Culbertson, 337 U.S. 733, 746 (1949) ("[T]he family relationship often makes it possible for one to shift tax incidence by surface changes of ownership without disturbing in the least his dominion and control over the subject of the gift or the purposes for which the income from the property is used."). Accordingly, we conclude the disputed wire transfers were not gifts.

When viewed in the light of the fact that petitioners owned and operated VK Lithuania within Europe, that they routinely purchased shipping containers to export vehicles, and that they received transfers from the business checking almost monthly, we agree with respondent that the most probable source of that income is sales of vehicles abroad. Petitioners conceded at trial and on brief that they underreported VK U.S.' gross receipts by $11,620 for 2006 and $99,090 for 2007. Petitioners have failed to establish a nontaxable source for the disputed gross receipts, and consequently we conclude that justice does not favor relieving them of the stipulation treating such amounts as gross receipts. Thus, we hold that

petitioners' 2006 and 2007 gross receipts are increased by $222,534 and $168,086, respectively.

III.    Schedule C Deductions

Petitioners reported on their 2006 and 2007 Schedules C that in connection with VK U.S.' trade or business they incurred expenses of $72,634 and $66,368, respectively.  Respondent allowed those deductions in full and credited petitioners with cost of goods sold for 2006 and 2007 in the respective amounts of $5,353 and $46,604.  As explained on brief, petitioners claim entitlement to additional trade or business expense deductions for 2006 and 2007 in the respective amounts of $9,602 and $23,602.[15]  Respondent replies that petitioners are not entitled to the additional deductions claimed because they have not proven that such expenses have not already been deducted on the 2006 and 2007 returns.  We agree with respondent.

Deductions are a matter of legislative grace, and taxpayers bear the burden of proving their entitlement to any deduction claimed.  Rule 142(a); INDOPCO, Inc. v.

---

[15]We calculated the additional deductions which petitioners claim they are entitled to for 2006 by subtracting the amount allowed as a deduction and claimed on the 2006 Schedule C, or $72,634, from the amount petitioners claim on brief they are entitled to, or $82,236.  We calculated the additional deductions to which petitioners claim entitlement for 2007 the same way; that is, we subtracted the amount allowed as a deduction and claimed on the 2007 Schedule C, or $66,368, from the amount petitioners claim on brief they are entitled to deduct, or $89,970.

Commissioner, 503 U.S. 79, 84 (1992). Taxpayers are allowed a deduction for ordinary and necessary business expenses paid or incurred during the taxable year in carrying on a trade or business. Sec. 162(a). Taxpayers must substantiate amounts claimed as deductions by keeping the records necessary to establish that they are entitled to the deductions. Sec. 6001(a); sec. 1.6001-1(a), Income Tax Regs.

Petitioners have failed to factually or legally establish that they are entitled to deductions over and above those respondent allowed. First, petitioners have failed to establish that the expense deductions to which they claim entitlement were not already claimed on the 2006 and 2007 returns. See Avery v. Commissioner, T.C. Memo. 1993-344, 66 T.C.M. (CCH) 305, 313 (1993) (no deduction for real estate taxes paid when taxpayers failed to prove the expenses were not already allowed as deductions). Second, portions of the expense deductions petitioners claim entitlement to in their petition, including shipping fees, shipyard fees, taxes, and duties, are not deductible because the supporting receipts suggest the expenses were ordinary and necessary business expenses of VK Lithuania and not VK U.S. See Welch v. Helvering, 290 U.S. at 114 (taxpayers may not deduct expenses of another

entity). Petitioners introduced no evidence concerning which counterparty bore the duties, fees, and taxes due upon arrival in Lithuania.

Third, taxpayers are required to keep records sufficient to establish the amounts of the deductions they claim. Sec. 6001; sec. 1.6001-1(a), Income Tax Regs. Even though we may estimate the amount of an expense where taxpayers introduce evidence demonstrating that they paid or incurred a deductible expense but cannot substantiate the precise amount, see Cohan v. Commissioner, 39 F.2d 540, 544 (2d Cir. 1930), we decline to do so here because petitioners have not persuaded us that such expenses were not already deducted on their 2006 or 2007 return. Fourth, petitioners have not persuaded us that receipts for postage, utilities, and other similar items are not nondeductible personal expenses. See sec. 262 (deductions for personal, living, and family expenses are not allowed). Fifth, petitioners did not explain how (if at all) the expenses claimed as deductions were ordinary and necessary to their import and export business. See sec. 162(a). On the basis of the foregoing, we conclude that petitioners have failed to establish that they are entitled to trade or business expense deductions in addition to those respondent has already allowed. Accordingly, we hold petitioners may not deduct trade or business expenses in addition to those respondent has already allowed.

IV.   Cost of Goods Sold

Notwithstanding the fact that petitioners reported zero cost of goods sold for each year at issue, respondent credited petitioners with costs of goods sold for 2006 and 2007 of $5,353 and $46,604, respectively.  Petitioners allege in the petition they are entitled to costs of goods sold above and beyond those allowed in the notice of deficiency.  We will sustain respondent's determinations.

Gross income is defined in section 61(a) to include "[g]ross income derived from business".  Sec. 61(a)(2).  A manufacturing or merchandising business, such as VK U.S., calculates gross income by subtracting cost of goods sold from gross receipts and adding investment income and proceeds from ancillary operations or sources.  Sec. 1.61-3(a), Income Tax Regs.  The cost of goods sold is determined under the taxpayer's regular method of accounting, see id., and includes the items acquired for resale and the cost of producing items for resale adjusted for opening and closing inventories, see Hultquist v. Commissioner, T.C. Memo. 2011-17, 101 T.C.M. (CCH) 1054, 1056 (2011); sec. 1.162-1(a), Income Tax Regs.[16]  In contrast, section 162 allows taxpayers a deduction for all ordinary and necessary business

---

[16]Certain small business owners with average annual receipts of $1 million or less, as VK U.S. was during the years at issue, need not take inventories at the beginning and end of each taxable year.  See Rev. Proc. 2001-10, sec. 4.01, 2001-1 C.B. 272, 273.

expenses incurred or paid during the taxable year. Sec. 162(a). Thus, cost of goods sold is an offset to gross receipts for purposes of computing gross income, and deductions are subtracted from gross income in arriving at taxable income. See B.C. Cook & Sons, Inc. v. Commissioner, 65 T.C. 422, 428-429 (1975), aff'd, 584 F.3d 53 (5th Cir. 1978).

Petitioners have not proved they are entitled to costs of goods sold above and beyond those allowed by respondent. Taxpayers bear the burden of substantiating the amount claimed as cost of goods sold. See Rodriguez v. Commissioner, T.C. Memo. 2009-22, 97 T.C.M. (CCH) 1090, 1092 (2009). Petitioners do not specify the amounts of costs of goods sold being claimed; nor do their records permit us to differentiate between costs generally incurred and costs relating to vehicles sold such that we might calculate costs of goods sold on our own initiative. Although we may estimate charges to gross income for items such as cost of goods sold, see Cohan v. Commissioner, 39 F.2d at 540; Jackson v. Commissioner, T.C. Memo. 2008-70, 95 T.C.M. (CCH) 1258, 1262 (2008), we decline to do so. Petitioners' records do not allow us to differentiate between the costs of goods sold they incurred and those respondent has already credited them for. Moreover, Ms. Kazhukauskas testified that she reported costs of goods sold as "supplies" on the 2006 and 2007 Schedules C, amounts which respondent allowed as deductions in

arriving at taxable income.  Thus, petitioners have been credited for costs of goods sold they substantiated on audit as well as additional amounts in the form of a tax-effected deduction.  Accordingly, we hold that petitioners are not entitled to claim cost of goods sold for 2006 or 2007 in addition to that allowed in the notice of deficiency.

V.    Self-Employment Tax

Respondent determined that petitioners are liable for self-employment tax under section 1401 for each year at issue.  Section 1401 imposes a tax on the self-employment income of individuals.  See sec. 1401(a) and (b).  Self-employment income generally means the gross income derived by an individual from carrying on a trade or business, less the allowable deductions attributable to that trade or business.  Sec. 1402(a) and (b); sec. 1.1402(a)–1, Income Tax Regs.  Petitioners presented no evidence to suggest that the Schedule C gross income earned from VK U.S. (less the allowable deductions) is not self-employment income.  Therefore, petitioners are liable for self-employment tax for 2006 and 2007 of $17,497 and $15,343, respectively, and they are entitled to deductions for one-half of the self-employment tax paid in the respective amounts of $8,749 and $7,672 as determined by respondent.  See sec. 164(f).

## VI. Accuracy-Related Penalties

Respondent determined for each year at issue that petitioners are liable for a 20% accuracy-related penalty for a substantial understatement of income tax under section 6662(a) and (b)(2). There is a substantial understatement of income tax for any year in which the amount of the understatement exceeds the greater of 10% of the tax required to be shown on the return or $5,000. Sec. 6662(d)(1)(A). Under section 7491(c), respondent bears the burden of producing sufficient evidence that imposition of the penalty is appropriate. See Higbee v. Commissioner, 116 T.C. 438, 446 (2001). Once respondent carries his burden of production, petitioners bear the burden of proving that the penalties are inappropriate because of reasonable cause, substantial authority, or other affirmative defenses. Id. at 446-447. The single most important factor to be considered when determining whether to excuse taxpayers from the accuracy-related penalty on account of reasonable cause is the extent to which the taxpayers sought to compute their proper tax liability. Sec. 1.6664-4(b)(1), Income Tax Regs.

Respondent has met his burden of production because petitioners' failure to report funds wire-transferred to them resulted in an understatement of income tax for each year in an amount of more than $5,000 and more than 10% of the tax required to be shown on the return. See Park v. Commissioner, 136 T.C. 569, 583

(2011) (the Commissioner met his burden of production by showing that failure to report income resulted in an understatement of income tax for each year at issue of more than $5,000 and more than 10% of the tax required to be shown on the return). Thus, petitioners bear the burden to prove that the accuracy-related penalty should not be imposed on account of reasonable cause or substantial authority. We will sustain respondent's determinations with respect to the accuracy-related penalties.

Among the deemed stipulated facts were that petitioners underreported their respective gross receipts for VK U.S. for 2006 and 2007 by $222,534 and $168,086 and that they lacked reasonable cause for failing to report those gross receipts. Those stipulations are treated as a binding and conclusive admission that may be qualified, changed, or contradicted only where justice requires it. See Rule 91(e). Petitioners have not asked to be relieved of the deemed stipulations, and we decline to grant such relief on our own. Petitioners conceded that VK U.S.' 2006 and 2007 gross receipts were underreported by more than $100,000, and they also admitted to falsely reporting VK U.S.' profits because, as they claimed on brief, they did not want to show that the business was facing bankruptcy. On the basis of these facts, we are convinced that justice requires that the deemed stipulation be binding upon

petitioners and that they made no effort to accurately report their 2006 or 2007 Federal income tax liability.  Accordingly, we hold petitioners are liable for accuracy-related penalties in the amounts respondent determined.

The Court has considered all of petitioners' arguments for a contrary result, and to the extent not discussed herein, we conclude those arguments are irrelevant, moot, or without merit.

To give effect to the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.